The opinion of the court was delivered by
Txughman, C. J.
It is a rule of law, that where an original is of a public nature, and admissible in evidence, an examined copy is evidence. This rule is necessary, for the preservation of public *263 papers, and for the public convenience, because those papers should always be in a known place, to which access may be had by all.. As au example of what may be called public papers, the English authors mention the journals of both houses of parliament, entries in the books of the Bank of England, and of the East India Company, parish registers, the books of the commissioners of the land tax, and excise, and court rolls of manors. The Bank of England and East India Company, have such immense concerns connected with the government, that their interests arc inseparable, and their books and papers are truly of a public nature. But to give that name to the banks of Pennsylvania, and, on the same principle, to incorporated insurance companies, &c., with which the country has been inundated, might produce serious consequences. We know, that these books are often badly kept, and it would be dangerous to admit copies in evidence, when the originals may easily be had, nor should even the originals be admitted, without proof, by whom the entries were made. The proper witnesses to prove the entries, are the clerks by whom they were made, if to be found. But, if dead, or out of the jurisdiction of the court, proof may be made of their handwriting. I would not be understood, however, as laying it down as a general rule, that in all cases the original books must be produced. That might often be extremely inconvenient; and perhaps there would be no danger in admitting an examined copy, with pi'oof that the original entry was made by an officer of the bank, — the officer himself to prove this, if to be found, and, if not, his handwriting to be proved. But in the case before us, there was a naked offer of an examined copy, uncorroborated by any other evidence whatever. This is not a new point. We decided it at Pittsburg, in the case of The Philadelphia Bank v. The Executors of Thomas Officer, at September term last; and, in accordance with that decision, I am of opinion, that the copies offered in this ease were properly rejected.
Besides this exception to the evidence, exceptions were taken to the charge of the court, which I will now consider.
1. It. was given in charge to the jury, that neither by the charter of the bank, nor the resolution of the board of directors, of the 6th of July, 1819, had the president alone power to draw the bill in question. To this I agree, with some explanation. The act of incorporation gives no authority to the president alone, to issue paper. It is enacted, by the eighth section of the incorporating act, “ that bills or notes issued by order of any of the said corporations, signed by the president and countersigned by the cashier, promising the payment of money, to any person or persons, his, her, or their order, or to bearer, though not under seal of the said corporation, shall be binding and obligatory on such corporation.”
This provision does not apply to the case before us, for this is not a bill promising to pay money; npr is it to be construed as a prohibition of drawing a bill like the present, unless under the seal *264 of the corporation, or signed by the president and countersigned by the cashier. When one bank draws on another, or an individual, I believe the usual course of transacting the business, is, to have the draft signed bjr the cashier, and not by the president. And this is authorized by the general practice, recognised by the. directors. The old doctrine, that a corporation can do no act, but under seal, has been frequently determined, not to be applicable to banks created by statute, so far, at least, as concerns the usual course of business, in drawing and discounting notes and bills. Still, the charge of the Court of Common Pleas was accurate, in laying down the law, that the charter of this bank gives the president alone no pojver to make this draft. I think it was accurate, also, in saying that no such power was given to the president alone, by the resolution of the directors of the Gthof July, 1819. That resolution confines the power to the president and cashier, jointly; and for this there was good reason. The cashier of the country banks is generally a more efficient and intelligent officer than the president. The cashier and president, jointly, but neither, separately, were authorized to borrow money or obtain discounts. Hut if it was intended to instruct ihe jury, that although both these officers had agreed to a plan of borrowing money or obtaining discounts, yet this plan could not be executed but by the use of paper signed by both of them, I cannot assent. The resolution required no such thing. It was satisfied by the agreement of both president and cashier, though the mode of effecting their purpose should be, by a note or bill, signed or endorsed, by only ■one of them. This very point came before the Supreme Court of the United States, in the case of Fletcher v. The United States Bank. There, the board of directors of the Planters’ Bank” (of New Orleans,) passed a resolution, “ that the president and cashier be authorized to adopt the most effectual measures to liquidate, the soonest possible, the balance due to the office of discount and deposit in this city, (Neto Orleans,) as well as others presently due, and which may in the future become due, to any banks in this city.” A note for ten thousand dollars, drawn by Fletcher, came to the possession of the Planters’ Bank, and was endorsed by their cashier, to the Bank of Discount and Deposit, in part payment of a balance due. It was objected, that the cashier, alone, had no authority to make the transfer. But Judge Stohy, who delivered the opinion of the court, held the contrary, and thus expressed himself: “The president and cashier were ,.t liberty to raise money for this purpose, from the general funds, in any way which the ordinary course of business would justify, and which they should deem the most effectual measure. They might therefore agree, that the cashier should endorse ihe note in question, and should procure it to be discounted at the Bank of the United States, and the proceeds to be carried to their credit.” I perfectly agree with the law,, S.s thus laid dowft by Judge Sxoltvy and *265 therefore, when this cause comes to trial again, it will be proper for the Court to instruct the jury accordingly.
The counsel for the defendant in error, have denied the power of the directors, to authorize the president and cashier to borrow money. But in this I think they are wrong. There again, the ease of Fletcher v. The United States Bank, (8 Wheat. 362,) bears upon the question; and, independently of that ease, the reason of the thing proves that the power exists. By the act of incorporation, section 7, “ the affairs of the company shall be conducted by the directors.” The power is general, and must be construed to extend to sdeh things as are convenient and usual, in the course of conducting the banking business. I have mentioned before, that the cashier is usually intrusted with the power to sign drafts by one bank on another, or on individuals. If this kind of business could only be done by an order of the board, in such case, it would be impossible to get forward. Neither would it be possible, in difficult times, when it was necessary frequently to borrow money, to transact the business with tolerable convenience, or facility, if a resolution of the board was required on each note, draft, or discount, for the purpose of borrowing. I am of opinion, therefore, that the directors dfd not exceed their powers, in the resolution of the 6th of July, 1819.
The president of the Court of Common Pleas .left it, very fairly and candidly, to the jury to decide, whether, from the evidence, it could be inferred, that the board of directors, (independently of their resolution of July, 1819,) had, directly or indirectly, sanctioned the bill drawn by Joseph Hulme; and told them, that if they had, the bank was bound by it. The plaintiff has no cause of complaint on this head. But there is another very important point, in which error has been alleged. The judge charged, that even supposing a bill like that on which this suit was brought, might lawfully have been drawn by the president alone, for the purpose of raising money for the bank, yet, if by fraud or collusion between him and Hollingshead, it was applied to the use of Hollingshead, the plaintiff could not recover, though it came to him fairly, in the usual course of business, and without notice of fraud or mal-practice. I confess, I do not see on what ground this opinion can be supported. The bill in question has been compared to a promissory note, and then the case of M‘Culloch v. Houstoji, 1 Dall. 441, has been relied on; in which it was decided, that the endorsee of a note, under the act of the 28th of May, 1715, takes it at his peril. As to that case, suffice it to say, at present, that although never overruled, it has always been regretted, and must not be considered as a precedent, to influence other cases of a dissimilar nature. Now, the paper before us is not a promissory note, but a draft, or bill, with which the act of 1715 has nothing to do. The plaintiff’s action, as endorsee, is not founded on that act, nor indeed does the act say one word about *266 bills, but is confined to the assignment of bonds, specialties, and promissory notes. The endorsee of an inland bill, rests his action on the custom of merchants, and not on any statute of England or Pennsylvania. This will be proved, by reference to the statutes of 9 and 10 W. 3. c. 17, and 3 and 4 Jinn. c. 9. It will be seen, that an action by the endorsee of a bill was in use before either of these statutes, and therefore neither of them gives him an action, although they give him some advantages which he had not before. Considering the case, then, on the general principles of mercantile law, it is very clear that the holder of negotiable paper, who has obtained it for value, in the course of business, and with perfect fairness, cannot be affected by fraud or collusion between the drawer and endorser, of which he had no notice. If ho could be so affected, there would be an end to the circulation of paper, and, of course, to the transaction of mercantile business beyond a very small circle. If the president of this bank, was authorized to raise money by a bill like the present,' the directors who trusted him, must run the risk of his integrity. And, should a loss happen, it must be borne.by those who confided in him, and not by an innocent person, who trusted to nothing but the funds of the bank. Whether the president was authorized to make this draft, and in what manner it came to the hands of the plaintiff, will be questions for the jury. This court has only to decide the law. I am opinion, there was error in the charge, and therefore the judgment is to be reversed, and another trial ordered.
Judgment reversed, and a venire facias de novo awarded.