Stoby, Justice,
 

 delivered the opinion of the court.
 

 —The Bank of the United States brought an action in the district court for Louisiana district, against William Fleckner (the plaintiff in error),
 
 upon
 
 a promissory note of Fleckner, dated the 26th of March 1818, for the sum of $10,000, payable to one John Nelder, or order, on the 1st of March 1820, for value received; and the bank, in their declaration by petition, made title to the same note through several mesne indorsements, ;-':the last of which was that of the President, &c., of the Planters’ Bank of New Orleans, through their cashier, as agent. The answer of Fleckner sets up several grounds of defence : first, that the Bank of the United States purchased the note in question from the Planters’ Bank, which was a trading, within the prohibitions of its charter ; secondly, that the transfer was usurious, it having been made in consideration of a loan or discount to the Planters’ Bank, upon which more than at the rate of six per cent, per annum was taken by the Bank of the United States ; thirdly, that the cashier of the Planters’ Bank had no authority to make the transfer ; fourthly, that the making of the promissory note was not a mercantile transaction, or governed by mercantile usages or laws, because it was given as a part consideration for the purchase by Fleckner of a plantation and slaves from Nelder, and that the notary before whom the sale was executed and recorded, wrote on the note, “
 
 ne
 
 varietur,” by which every holder of the note might know it was not a mercantile transaction, and could obtain knowledge of the circumstances under which it was given. And the answer proceeds to state, that Nelder had no title to a part of the plantation and slaves, and that the note ought not to be paid, until the title was made good ; and it then prays, that the matters thus alleged and put in issue may be inquired of by a jury. The issue was joined, and on trial, the jury found a verdict for the Bank of the United States ; and the cause now comes before *us upon a writ of and a bill of exceptions taken at the trial.
 

 The various grounds assumed by the answer, which are substantially the
 
 *154
 
 same as taken by the exceptions, will be considered by the court in the order in which they have been mentioned.
 

 And first, as to the alleged violation of the charter by the Bank of the United States, in purchasing the note in question. The act of congress of the 10th of April 1816, ch. 44, incorporating the bank, in the ninth rule of the fundamental articles, declares (§ 11, art. 9), that “the said corporation shall not, directly or indirectly, deal or trade in anything except bills of exchange, gold or silver bullion, or in the sale of goods, really and truly pledged for money lent, and not redeemed in due time, or goods which shall be the proceeds of its lands. It shall not be at liberty to purchase any public debt whatsoever, nor shall it take more than at the rate of six per centum per annum, for or upon its loans or discounts.” It certainly cannot be a just interpretation of this clause, that it prohibits the bank from purchasing anything but the enumerated articles, for that would defeat the powers given in other parts of the act. The 7th section declares, that the bank shall have capacity to purchase, receive, &c., lands, &c., goods, chattels and effects, of whatsoever kind, nature and quality, to an amount not exeeding $56,000,000, and the same to sell, grant, demise, alien and dispose of. And where the act means to prohibit purchases of any particular thing, it uses the very term, as in the prohibition *of purchasing any public debt, in this very clause. And certainly, there is no pretence to say, that if discounting promissory notes be a purchase in point of law, it could have been the legislative intention to include such an act in the prohibition. It is notorious, that banking operations are always carried on in our country by discounting notes. The late Bank of the United States conducted, and all the state banks now conduct, their business in this way. The principal profits of banks, and indeed, the only thing which make them more valuable than private stock, arises from this source. The législature cannot be presumed ignorant of these facts ; and it would be absurd to suppose, that it meant to create a bank, without any powers to carry on the usual business of a bank. The act contemplates throughout, an authority to make loans and discounts. It provides expressly for the establishment of offices of discount and deposit; and the very clause now under consideration, recognises the power of the bank to make loans and discounts, and restricts it from taking more than six per cent, on such loans or discounts. But in what manner is the bank to loan
 
 ?
 
 What is it to discount ? Has it not a right to take an evidence of the debt, which arises from the loan ? If it is to discount, must there not be some
 
 chose in
 
 action, or written evidence of a debt, payable at a future time, which is to be the subject of the discount? Nothing can be clearer, than that by the language of the commercial world, and the settled practice of banks, a discount by a bank means,
 
 ex vi termini,
 
 a deduction or *drawback made upon its advances or loans of money, upon negotiable paper, or other evidences of debt, payable at a future day, which are transferred to the bank. We must suppose that the legislature used the language in this its appropriate sense ; and if we depart from this settled construction, there is none other which can be adopted, which would not defeat the great objects for which the-charter was granted, and make it, as to the stockholders, a mere mockery. If, therefore, the discounting of a promissory note, according to the usuge of banks, be a purchase, within the meaning of the 9th rule above stated (upon which serious doubts
 
 *155
 
 may well be entertained), it is a purchase by way of discount, and permitted, by necessary inference, from the last clause in that rule.
 

 The true interpretation, however, of that rule is, not that it prohibits purchases generally, but that it prohibits buying and selling for the purposes of gain. It aims to interdict the bank from doing the ordinary business of a trader or merchant, in buying and selling goods, &c., for profit, and uses the words “ deal ” and “ trade,” in contradistinction to purchases, made for the accommodation or use of the bank, or resulting from its ordinary banking operations. And that this is the true sense of the rule, is strongly evinced by the 12th section of the act, which enforces a penalty for the violation of this very rule. It enacts, that if the bank, “ or any person or persons for, or to the use of the same, shall deal or trade in buying or selling goods, wares, merchandise or commodities whatsoever, ^contrary to the provisions of this act, all and every person, &c., shall forfeit, &c., treble the value of the goods, &c., in which such dealing and trading shall have been.” The words “ dealing and trading ” are used as equivalent in meaning, and they are connected with “ goods, wares, merchandises and commodities,” which words, in mercantile language, are always used with reference to corporeal substances, and never to mere
 
 choses in action.
 
 And as there is no reason to suppose, that the penalty was not intended to be coextensive with the prohibitions of the 9th rule, the exception of bills of exchange in that rule, was either inserted
 
 ex majori cautela,
 
 or designed to authorize the purchase and sale of bills of exchange, at a price above their par value. At all events, doubtful phraseology of this sort cannot be admitted to overrule a clear legislative intention of authorizing discounts ; and if so, as there are no words restricting the discounts to any particular kind of paper, the right must equally apply to all kinds.
 

 The evidence in the case shows, that the note in question was discounted for the Planters’ Bank, by the Bank of the United States, and after deducting, for the time the note was to run, a sum equal to the rate of six per cent, per annum, the residue was carried to the credit of the Planters’ Bank, which, it seems, was then indebted to the Bank of the United States in a large sum of money. It is immaterial to the decision of the point now under consideration, whether the discount was for this purpose, or not, for whether the *proceeds were to be paid over, or carried to the general credit of the party, or applied to the payment of a pre-existing debt, the transaction was still, in substance, a discount, and therefore, not within the prohibitions of the 9th rule of the charter. The district judge, therefore, who sat at the trial, was perfectly correct in refusing to charge the jury, as the counsel for Fleekner requested, “ that the receiving the transfer of the said promissory note, and the payment of the amount in account, as stated in the evidence, was a dealing in notes, and such dealing was contrary to the provisions of the act incorporating the said bank.” And he was equally correct in charging the jury, “ that the acceptance of an indorsed note, in payment of a debt due, is not a trading in things prohibited by the act.” And this was the whole of his charge on this point, brought up by the exceptions.
 

 It may be added, upon this point, that even if the bank had violated the rule above stated, by this particular transaction, it is not easy to perceive, how that objection could be available in favor of Fleekner. The act has not pronounced, that such a violation makes the transaction or contract
 
 ipso
 
 
 *156
 

 facto
 
 void ; but has punished it by a specific penalty of treble the value. It would, therefore, remain to be shown how, if the bank had a general right to discount notes, a contract not made void by the act itself, could, on this account, be avoided by a party to the original contract, who was not a party to the subsequent transfer.
 

 *The next point arising on the record is, whether the discount taken in this case was usurious. It is not pretended, that interest was deducted for a greater length of time than the note had to run, or for more than at the i-ate of six per cent, per annum on the sum due by the note. The sole objection is, the deduction of the interest from the amount of the note, at the time it was discounted ; and this, it is said, gives the bank at the rate of more than six per cent, upon the sum actually carried to the credit of the Planters’ Bank. If a transaction of this sort is to be deemed usurious, the same principle must apply with equal force to bank discounts, generally, for the practice is believed to be universal; and, probably, few, if any, charters, contain an express provision, authorizing, in terms, the deduction of the interest in advance upon making loans or discounts. It has always been supposed, that an authority to discount, or make discounts, did, from the very force of the terms, necessarily include an authority to take the interest in advance. And this is not only the settled opinion among professional and commercial men, but stands approved by the soundest principles of legal construction. Indeed, we do not know in what other sense the word discount is to be interpreted. Even in England, where no statute authorizes bankers to make discounts, it has been solemnly adjudged, that the taking of interest in advance by bankers, upon loans, in the ordinary course of business, is not usurious.
 

 If, indeed, the law were otherwise, it would not follow, that the transfer to the bank of the present *note would be void, so that the maker of the note could set it up in his defence. The statutes of usury of the states, as well as of England, contain an express provision, that usurious-contracts shall be utterly void ; and without such an enactment, the contract would be valid, at least, in respect to persons who were strangers to the usury. The taking of interest by the bank, beyond the sum authorized by the charter, would, doubtless, be a violation of its charter, for which a remedy might be applied by the government; but as the act of congress does not declare, that it shall avoid the contract, it is not perceived, how the original defendant could avail himself of this ground to defeat a recovery. The opinion of the district judge, that the discount taken in this case was not usurious, and would not defeat the right of recovery of the plaintiffs, was, therefore, unexceptionable in point of law.
 

 The next point is, whether the indorsement of the note, by the cashier of the Planters’ Bank, was sufficient to transfer the property to the original plaintiffs. The evidence on this point was, that the board of directors of the Planters’ Bank, on the 21st of October 1818, passed a resolution, “that the president and cashier be authorized to adopt the most effectual measures to liquidate, the soonest possible, the balance due to the office of discount and deposit in this city (IsTew Orleans), as well as all others presently due, and which may in the future become due to any banks of the city.” The indorsement was made to the Bank of the United States, on the 5th of September *1819 ; and before the commencement of this suit, viz.,
 
 *157
 
 on the 27th of June 1820, the hoard of directors of the Planters’ Bank passed a resolution, to which the corporate seal was annexed, declaring, that the two notes of the defendant (of which the present note was one) “ wei-e indorsed by the late cashier of the Planters’ Bank, by authority of the president and directors, and delivered to the office of discount and deposit of the Bank of the United States, and the amount passed to the credit of the Planters’ Bank, and that the said hoard of directors do hereby ratify and confirm said act of their said cashier, as the act of the president, directors and company of the Planters’ Bank.” The act incorporating the Planters’ Bank has been examined by the court; and as to the appointment of the cashier, and the authority of the board of directors, it does not differ materially from acts incorporating other banks. It authorizes the president and directors to appoint a cashier, and other officers of the bank, and gives the president and directors, or a majority of them, “full power and authority to make all such rules and regulations, for the government of the affairs, and conducting the business of the said bank, as shall not be contrary to this act of incorporation.” Act of 15th April 1811, 1 Martin’s Dig. 568,
 
 et seq.
 
 It contains no regulations as to the duties of the cashier, nor any express authority for the corporation to make by-laws. The whole business of the bank is confided entirely to *the directors ; and of course. with them it would rest, to fix the duties of the cashier or other officers. Whether they have in fact made any regulations on this subject, does not appear; but the acts of the cashier, done in the ordinary course of the business actually confided to such an officer, may well be deemed
 
 primé facie
 
 evidence, that they fell within the scope of his duty.
 

 The first objection urged against this evidence is, that the corporation could not authorize any act to be done by an agent, by a mere vote of the directors, but only by an appointment under its corporate seal. And the ancient doctrine of the common law, that a corporation can only act through the instrumentality of its common seal, has been relied upon for this purpose. Whatever may be the original correctness of this doctrine, as applied to corporations existing by the common law, in respect even to which it has been certainly broken in upon in modern times, it has no application to corporations created by statute, whose charters contemplate the business of the corporation to be transacted exclusively by a special body or board of directors. And the acts of such body or board, evidenced by a written vote, are as completely binding upon the corporation, and as complete authority to their agents, as the most solemn acts done under the corporate seal. In respect to banks, from the very nature of their operations in discounting notes, in receiving deposits, in paying checks, and other ordinary and daily contracts, it would be impracticable, to affix the corporate seal as a confirmation of each individual act. And if *a general authority for such purposes, under the corporate seal, would be binding upon the corporation, because it is the mode prescribed by the common law, must not the like authority, exercised by agents appointed in the mode prescribed by the charter, and to whom it is exclusively given by the charter, be of as high and solemn a natui’e to bind the corporation ? To suppose otherwise, is, to suppose, that the common law is superior to the legislative authority ; and that the legislature cannot dispense with forms, or confer authorities, which the common law attaches to general corporations. Where corporations have
 
 *158
 
 no specific mode of acting prescribed, the common-law mode of acting may be properly inferred ; but every corporation created by statute, may act as the statute prescribes, and the common law cannot control by implication that which the legislature has expressly sanctioned. Indeed, this very point has been repeatedly under the consideration of this court; and in the case of
 
 Bank of Columbia
 
 v.
 
 Patterson
 
 (7 Cranch 299), and
 
 Mechanics’ Bank of Alexandria
 
 v.
 
 Bank of Columbia
 
 (5 Wheat. 326), principles were established which settle the point, that the corporation may be bound by contracts not authorized or executed under its corporate seal, and by contracts made in the ordinary discharge of the official duty of its agents and officers. We have no doubt, therefore, upon the principles of the common law, that a vote of the board of directors of the Planters’ Bank, was as full authority *for any act of this nature, to bind the corporation, as if it had passed under the common seal.
 

 But it is to be recollected, that the rights and authorities, and mode of transacting business, of the Planters’ Bank, depend, not upon the common law, but upon the charter of incorporation, and where that is silent,, upon the principles of interpretation, and doctrines of the civil law, which has been adopted in Louisiana. The civil code of that state declares, that as corporations cannot personally transact all that they have a right legally to do, wherefore it becomes necessary for every corporation to appoint some of their members, to whom they may intrust the direction and care of their affairs, under the name of mayor, president, syndics, directors or others, according to the statutes and qualities of such corporations ; it further declares, that the attorneys in fact, or officers thus appointed, have their respective duties pointed out by their nomination, and exercise them according to the general regulations and particular statutes of the corporation; that these officers, by contracting, bind the communities to which they belong, in such things as do not exceed the limits of the administration which is intrusted to them ; and that if the powers of such officers have not been expressly fixed, they are regulated in the same manner as those of other mandatories. Civil Code La. tit. 10, ch. 2, art. 13 and 14. This is all that is contained upon the subject now under consideration, in the title of the code professing to treat of corporations, and *their rights, powers and privileges. There is nothing which, in the slightest degree, points to the necessity of using a corporate seal in appointing agents, or authorizing corporate acts ; and the fair inference deducible from the silence of the code is, that it does not contemplate any such formality as essential to the validity of any official acts done by the officers of the corporation ; and gives such acts a binding authority, if evidenced by a vote.
 

 We may, then, dismiss this point, as to the necessity of the corporate seal, and proceed to consider another objection stated by the counsel for the original defendant. It is, that the cashier had no authority to make this transfer; that the resolution of the 21st of October 1818, did not confer it originally, and that the subsequent ratification, by the resolution of the 27th of June 1820, does not give any validity to an ineffectual and unauthorized transfer. We are very much inclined to think, that the indorsement of notes, like the present, for the use of the bank, falls within the ordinary duties and rights belonging to the cashier of the bank, at least, if his office be like that of similar institutions, and his rights and duties are not other
 
 *159
 
 wise restricted.
 
 [1]
 
 Tbe cashier is usually intrusted with all the funds of the bank, in cash, notes, bills, &e., to be used, from time to time, for the ordinary and extraordinary exigencies of the bank. He receives, directly, or through the subordinate officers, all moneys and notes. He delivers up all discounted notes, and other property, when payments have been duly made. He draws checks, from time to time, *for moneys, wherever the bank has deposits. In short, he is considered the executive officer, through whom, and by whom, the whole moneyed operations of the bank, in paying or receiving debts, or discharging or transferring securities, are to be conducted. It does not seem too much, then, to infer, in the absence of all positive restrictions, that it is his duty as well to apply the negotiable funds, as the moneyed capital, of the bank, to discharge its debts and obligations. And under these circumstances, the provision of the civil code, already cited, may be justly applied, that where his powers are not otherwise fixed, they are to be regulated as other mandatories, or rather, as other agents and factors. In point of practice, it is understood, and was so stated by one of the learned counsel, whose knowledge and experience upon this subject entitle his statement to the highest credit, that these duties are ordinarily performed by the cashiers of banks. And general convenience and policy would dictate this arrangement as most salutary to the interests of the banks. And it may be added, that the very act done by the cashier, in this case, with the approbation of the bank, affords some presumption that it was not a usurped authority.
 

 But waiving this consideration, let us attend to the actual features of this case, upon the evidence. It is true, that the resolution of the 21st of October, does not directly, and in terms, authorize this transfer. It is not a resolution conferring a joint authority to the president and cashier, to indorse any note for the bank. It simply requires them to *take measures to liquidate the balance due to the original plaintiffs, and other banks. It is merely directory to them, and leaves them to decide as to the time, the mode and the means. As they were not restricted in these respects, they had a resulting right to employ any of the funds of the bank for this purpose, and the negotiable paper of the bank was equally within the scope of the authority, as the cash funds, if they should deem it proper to use them. They were at liberty to raise money for this purpose, from the general funds, in any way which the ordinary course of business would justify, and which they should deem the most effectual measures. They might, therefore, agree that the cashier should indorse the note in question, and should procure it discounted at the Bank of the United States, and the proceeds to be carried to their credit. The presumption that this was an exercise of authority, sanctioned by the president, as well as contemplated by the directors, is almost irresistibly proved by the fact, that the Planters’ Bank has never complained of, but ratified and approved the whole trans
 
 *160
 
 action. Some criticism has been employed on the meaning of the word
 
 *l
 
 liquidate,” in the resolution above stated. It is said, to mean, not a payment, but an ascertainment of the debts of the bank. We think otherwise. Its ordinary sense, as given by lexicographers, is to clear away, to lessen debts. And in common parlance, especially among merchants, to liquidate a balance, means, to pay it; and this, we are satisfied, was the sense in which the words were used in this resolution ; *and, consequently, that the appropriation of this note to the payment of the debt, was within the scope of the authority given to the president and cashier.
 

 But if this were susceptible of doubt, we think, that the subsequent resolution of the directors, of the 27th of June 1820, is conclusive. That resolution is not a mere ratification of the transfer, but declares, that the indorsement was made by the cashier, on the 4th of September 1819, by authority of the president and directors. It is, therefore, a direct and positive acknowledgment of its original validity, binding on the bank ; and if so, it is binding upon all other persons who have not an adverse interest. But if it were only a ratification, it would be equally decisive. No maxim is better settled, in reason and law, than the maxim
 
 omnis ratihabitio retro-trahitur, et mandato priori eequiparatur;
 
 at all events, where it does not prejudice the rights of strangers. And the civil law does not, it is believed, differ from the common law on this subject. See Civil Code of Louisiana, tit. 3, ch. 6, § 4.
 

 We think, then, that the transfer in this case was made upon sufficient authority ; and that, therefore, the opinion of the district judge, affirming the same doctrine, was perfectly correct.
 

 The next point made by the counsel for the original defendant, is, that the writing of the words “
 
 ne varietur,”
 
 upon the note, restricted its negotiability. It appeared in evidence, that the note in question was given as a part consideration for *the purchase-money of a plantation and slaves, purchased by Fleckner of Nelder. The instrument of conveyance was drawn, executed and recorded, before a notary-public, according to the usage in countries governed by the civil law. The notary, upon the giving of this and other notes, for the purchase-money, by Fleckner, wrote on each note the words in question. There is not the slightest evidence that, by the law or custom of Louisiana, the introduction of these words affects the negotiability of these notes ; and without proof of such law or usage, this court certainly cannot infer the existence of such an extraordinary and inconvenient doctrine. Upon the face of the transaction, we should suppose, that the words were written merely for the purpose of ascertaining the identity of the notes ; and the statement at the bar, that this is the explanation given by a very learned notary, confirms this supposition. The opinion of the district judge upon this point also, asserting that the words did not create any restriction upon the negotiability of the note, is, so far as we have any knowledge, a true exposition of the law.
 

 It is unnecessary to pursue this subject further. The judgment of the court below is affirmed, with interest and costs.
 

 Judgment. — This cause came on to be heard, on the transcript of the record of the district court of the United States for the district of Louisiana, and was argued by counsel: On consideration whereof, it is adjudged and
 
 *161
 
 ordered,- that the judgment of the said district court for the district of Louisiana, in this case, be and the same is hereby affirmed, with costs and damages, at the rate of eight per centum per annum, including interest on the amount of the judgment of the said district court.
 

 [1]
 

 The cashier is the financial officer of the bank, and his authority to transfer its negotiable paper, for a legitimate purpose, is undoubted. Bank of New Haven
 
 v.
 
 Perkins, 29 N. Y. 554. Evidence of the powers habitually exercised by a cashier of a bank, with its knowledge and acquiescence, defines and establishes, as to the public, those powers, provided they be such as the directors of the bank may, without violation of its charter, confer on such cashier, Merchants’ Bank
 
 v.
 
 State Bank, 10 Wall. 604. And see Matthews
 
 v.
 
 Massachusetts Bank, 1 Holmes 396.