Brockenbrougii, J.
dissented. He said—I am disposed to pay more respect to the certificate of the judge before whom the issue in this case was tried, than the chancellor did. A series of decisions has, I think, established the general principle, that where the judge of the court of law certifies, that the verdict is against evidence, the conscience of the chancellor should not be satisfied with the finding. It is true, the object in directing the issue is to obtain the decision of the jury on the disputed matter of fact; but I can see no reason why the salutary control which the courts of law exercise over verdicts in trials at common law, should not prevail *210 ■when they are called on to superintend the trial of issues directed by a chancellor. In the former case, they will grant new trials where the verdict is palpably against evidence; i the latter case, they cannot grant a new trial, but their opinion on the verdict is just as important as when they have entire control over it. To prove that the chancellor ought not to be satisfied where the certificate of the judge is against the verdict, I refer to what is said by president Pendleton in the cases of Pleasants & al. v. Ross, and Southall v. M’Keand. Nor is the principle there laid down shaken by Ross v. Pynes, and M’Rae v. Woods: in the former case, there had been a verdict for the plaintiff in the suit at common law and a judgment of the district court, and the case having been carried into equity by an injunction, and an issue directed, the issue was found for the same party, and heavier damages assessed than before. The certificate of the judges was not allowed to prevail over two concurring verdicts, and the opinion of the first court of law. In M’Rae v. Woods, there were also two concurring verdicts, and on the trial of the last issue, the 'court certified, that there was no evidence adduced except that which appeared in the record. That evidence was contradictory; and this court was of opinion, that it was difficult, if not impossible, to reconcile it. Under these circumstances it held, that after a protracted controversy of thirty-eight years, and the opinions of two juries, the verdicts ought to prevail, and the dispute to end. No case has been produced, in which, after a single trial, the certificate of the judge against the verdict, has been entirely disregarded.
In the present case, the judge did not content himself with making a general certificate, that the verdict was contrary to evidence; he has certified the facts which were proved on the trial. It is urged, that he had no other evidence before him than that which appears in this record, and that the chancellor could decide for himself, whether the judge had drawn the proper inferences from that evidence, and whether that evidence did prove the facts which he certified to have been proved. I do not think it clear, that he *211 had no other evidence than that which we see. He certitied, that there were no other witnesses examined than such as had heretofore given their affidavits or depositions; the direct inference from which statement, is, that there was parol evidence before him; that the witnesses, who had given their depositions, were examined vivd voce in open court. This is also apparent from the circumstance, that Weaver’s counsel applied to him to certify that there was no parol evidence before the jury touching the fact as to the time of the loan of Ewell’s notes ; leaving the strong inference that there was parol evidence touching other facts than that specified. There having been, then, parol evidence before the circuit court, we cannot say, that the chancellor liad the same evidence before him, which the judge of the circuit, court had. The witnesses, although the same, might have been examined and cross examined, on many points not noticed in their depositions, and touching numerous circumstances, which though apparently trivial, were really important, and might have had an important bearing on the main question, but which did not occur to the parties or witnesses, when their depositions were taken in the country. The record does not shew the manner of the witnesses, by which the chancellor could judge of the weight of the evidence. In short, we all know the great difference between a trial by depositions, and a trial by viva voce examinations; and we cannot therefore say that the chancellor had, or that this court has, the same materials on which to found a judgment that the judge of the circuit court had.
As the judge has certified the facts which were proved before him, I think we must see whether they support the allegations of the plaintiff. If they do so, I cannot perceive how the verdict can be satisfactory; but if they are not relevant to the case, or do not support the charges in the bill, the certificate was rightly disregarded. I admit, also, that if the judge has certified facts as proved, which shew that the defendant practised usury on the plaintiff, yet if the plaintiff has made no such allegation in his bills, the facts so certified, however important and however true, can have no weight. *212 Oa comparing the pleadings with the certificate, I have come to the conclusion, that some of the facts certified ought to have been held fatal to the claim of the plaintiff, for the whole amount of the bond on which the judgment at law was rendered,—whilst others, though proved, were not such as the plaintiff had complained of, and were therefore out of the case.
The bill charges, amongst other things, that in December 1815, the sum of 1000 dollars in cash, and two bonds of Ewell of which the principal was 466 dollars 66 cents, were lent by the defendant to the plaintiff; that on the 23rd-May 1817, the plaintiff with Foote as his surety executed a bond to the defendant for 1636 dollars 44 cents; that the defendant exacted of him an usurious rate of interest on the money and bonds so lent, which usurious interest was included in, and made part of the bond. The issue directed, was to ascertain, whether that bond was given on an usurious consideration. The judge certified, that the three • following facts were proved: 1. that Ewell’s bonds were lent between the 18th July and the 15th December 1814; 2. that afterwards, about and before the 15th December 1815, the sum of 1000 dollars was lent; and 3. that on the 23rd May 1817, the bond for 1636 dollars 44 cents was executed, and that it was compounded of Ewell’s bonds with interest from the date of the loan or transfer of them, and the 1000 dollars with interest from the date of that loan. These three facts are within the allegations of the bill, and support them. The bonds of Ewell were payable at periods posteriour to the transfer of them, namely, one of them on the 3rd of February 1815, and the other on the 3rd February 1816. If, then, Gh'igsby was to pay interest on them from a prior period, and the principal with this additional interest entered into the composition of the bond of 23rd May 1817, can there be any question, that it was tainted with usury ?
I admit, it is settled, that a man may lawfully purchase a bond fide bond at a discount; Hansbrough v. Baylor, 2 Munf. 36. But I have yet to learn, that a lender may take *213 a premium for a bond, that he may exact more for it than its value, without subjecting himself to the penalties of usury. The statute declares, that no person shall upon any contract take, directly or indirectly, for the loan of any commodity, above the value of six dollars for the forbearance of 100 dollars for one year. It was once doubted, whether the practice of bankers in discounting bills, by taking interest in advance, was not within the statutes of usury, for “ upon a nice calculation,” said lord Mansfield, “ it will be found, that the practice of the hank in discounting bills exceeds the legal rate of interestyet it was determined not to be usury on the ground of long established mercantile usage, which the statute did not mean to destroy; Cowp. 115. So with us, it is looked upon as a settled point, that, in banking transactions, it is not usury to take interest in advance on discounts or loans: and this is on the ground, that an authority to discount or to make discounts, granted by all the hank charters, by the very force of the terms, necessarily includes an authority to take interest in advance; Stribbling v. Bank of the Valley, 5 Rand. 144. Fleckner v. U. S. Bank, 8 Wheat. 338. But, in the ordinary transactions of buying and selling, transferring and assigning bonds, I know of no mercantile usage, nor of any statutory enactment, that will authorize the lender to take more for the bond than the legal rate of interest.
I understood the counsel for the appellee as endeavouring to obviate the force of this objection, by stating cases in which it may be lawful to give more for a bond than the legal rate. Thus, if a Louisiana or Mississippi bond, where the rate of interest is higher than with us, be sold here, such a contract would be lawful. This may be so, but the cases are not alike. The bonds in this case are Virginia bonds. The transferring of them, for the purpose of lending their avails to another, will not, according to my apprehension, justify the taking for them more than the law allows.
It has been urged, that notwithstanding the certificate of the judge that these facts were proved, yet the chancellor *214 ought to have disregarded it, on the ground, that there was probably a mistake in the calculation, by which mistake the amount due at the time of taking the bond of the 23rd May 1817, was made larger than it ought to be. I agree that a miscalculation would never charge a party with usury: but it will not be denied, that whenever the intention is to take more than legal interest, the party is chargeable with usury, although he may never have heard that such was the law, and may not have known that he was violating it. Chillers v. Deane, 4 Rand. 410. But here, there is no ground for believing, that there was a miscalculation: the judge certifies, that the interest on the bonds was calculated from the time they were lent. I know the usury thus taken, was small in amount; but, nevertheless, it vitiated the contract, and justified the appellant in coming into a court of equity to compel the lender to receive his principal money without any interest, under the 3rd section of the statute against usury.
I said, there were some facts certified by the judge to have been proved, which were not complained of, and therefore are out of the case. These facts are, that for the loan of 1000 dollars about and before the 15th December 1815, the plaintiff agreed to pay the defendant at the rate of twelve or twelve and a half per cent, interest, and that on the 23rd May 1817, when the consolidating bond was taken, that agreement was subsisting, and continued to subsist till May 1821, when the usurious bond of 490 dollars 90 cents was taken. These certainly are most important facts, and if there were allegations in the bill to justify such proof being made, I could not hesitate to say, that the whole of the contract, and not a part only, was usurious, and that another jury ought to pass on the whole subject. I think too, that the record exhibits cogent proof to justify the judge in certifying, that such were the facts. How else can we rationally account for the bond of May 1821, for 490 dollars 90 cents? Calculate the interest on 1000 dollars at twelve and a half per cent, from the 23rd May 1817 to the 1st May 1821, when the smaller bond was given, and it pro *215 duces almost exactly that very sum. I know, that an agreement to pay illegal interest after the loan made, will not vitiate the contract of loan, unless it can he fairly inferred, that such agreement or understanding existed at the time of the loan; but a bond taken at a subsequent period, with proof of declarations by the lender, that he did lend at the rate which the bond exhibits, may justify the inference, that the loan and the corrupt agreement were simultaneous. And I should not think, that such inference could bo repelled by the flimsy pretext, that a draft at one time of 1000 dollars, and a bond at another for nearly 500 dollars, both of which were actually delivered and received, were gratuitous donations from the borrower to the lender. It is an absurd and incredible proposition, that a needy and embarrassed borrower should make a present of large sums to a thriving wealthy lender.
But it so happens, that the proof on this subject, however strong and apparent to the mind of the judge, was unavailing. He did not probably attend much to the pleadings, but looked to the issue he was required to try. The original bill no where alleges, that at the time of the loan of the 1000 dollars, there was any agreement to pay any usurious interest for the use of it, other than the usury which was included in the bond. Nor is there any allegation in the original bill, that at the time of taking the bond of the 23rd May 1817, the agreement to pay such usurious interest was subsisting, and continued to subsist till May 1821. On the contrary, after charging that the whole of the previous usury was included in the bond, it merely charges, that at a subsequent period, namely, in 1819, another bond for about 500 dollars was exacted, which was the extra and usurious interest on the debt, evidenced by the consolidating bond of the 23rd May 1817. Nor does the amended bill allege any agreement, at the time of the loan of the 1000 dollars, to pay twelve or twelve and a half per cent.; but it alleges, that for the use of it, the plaintiff agreed to give the draft on his counsel before mentioned. This agreement for the draft is not the one meant by the judge, when he says it was *216 agreed to give twelve or twelve and a half per cent.; but, on the contrary, he says, that this draft was given sometime afterwards, without saying that it was given in pursuance of a previous agreément. The allegation in the amended bill is different entirely from that which the judge says was proved, and, therefore, those two important facts proved before him, namely, the agreement to pay twelve or twelve and a half per cent., at the time of the loan of the 1000 dollars, and the subsistence of that agreement when the bond of May 1817 was executed, are entirely out of the case. Nor does the amended bill allege any new agreement at this latter period for that usury, but places the bond of 490 dollars 90 cents on the footing of a substitute for the before mentioned draft. But, although these last facts are out of the allegations of the bill, and therefore the certificate of the judge as to them should be disregarded, yet the other facts, which he certifies to have been proved, support the allegations; and I, therefore, think that the conscience of the chancellor should not have been satisfied with the verdict, and that it should be set aside.
The counsel for the appellee made a calculation from data, which he supposed the answer furnishes, by which he made the amount due from Grigsby on the 23rd May 1817, within a few cents of the amount of the bond on that day executed, without calculating the interest on the bonds from the day of their transfer, but from the days on which they respectively became due. This has been adopted also by my brotheTCarr. It is founded on the supposition, that the 1000 dollars were lent late in the spring of 1815. If, instead of taking a day not late but early in the spring, we calculate interest on the 1000 dollars, and then calculate interest on the bonds from the days on-which they are respectively payable, we produce a sum too large for the bond of 23rd May 1817; and, therefore, this argument proves too much. But let us attend to the terms of Weaver’s answer to the amended bill. He says, he is now induced to believe, that the loan of Ewell’s bonds was in 1814, or prior thereto: he is certain, that the loan of the 1000 dollars was in 1S15, *217 and the loan of the bonds was between one and two years before. He is unable to answer as to the particular time of the year 1815, in which the money was lent, but thinks it was in the winter of 1814, or early in the spring of 1815, and he has some impression that Grigsby did mention to him that he had a wish to become a subscriber to the Warrenton bank then spoken of. Nothing can be more vague as to time, than this answer of the defendant, made to a pointed and direct question put in the amended bill, namely, at what time of the year 1815 did he lend the plaintiff the sum of 1000 dollars ? And whether it was not known to him, that it was for the purpose of subscribing to the Warrenton bank then about to be established ? If there is any thing of which he is certain, it is that he lent the money in 1815, and the loan of the bonds was between one and two years before, that is, more than one year before the loan of the money. Now, if the money was lent early in the spring of 1815, say, the 1st April, then the bonds must have been lent early in the spring, or late in the winter of the year before, that is, say February, or March 1814. But that is impossible, for the bonds were not executed by Ewell to John Gordon, till the 13th June 1814, and they were not assigned to Weaver until 28th September 1814; at least, such is the date of the assignment of one of them. Now, let us suppose that the bonds were transferred by Weaver to Grigsby, on the very day that they were assigned to him, and that the 1000 dollars were lent between one and two years, that is, more than one year after the transfer of the bonds. I shall assume the 20th of October 1815, as the date of the loan of the money, for that is more than a year after the bonds might have been transferred. Then, let interest be computed on the bonds, not from the day they were due, but from the day of their transfer, according to Weaver’s admission in his first answer, and calculate interest on the money loaned, from the 20th October. The result is as follows: the principal sum of Ewell’s two bonds was 466 dollars 66 cents, and the interest thereon from the 28th September 1814 to the 23rd May 1817, is 74 dollars 28 cents: the principal *218 of the money loaned was 1000 dollars, and the interest on it from the 20th October 1815 to the 23rd May 1817, was 95 dollars 50 cents: the aggregate is 1636 dollars 44 cents— making the precise sum for which the bond of the 23rd May 1815 was taken: and if so, it was usurious, because of the interest calculated on Ewell’s bonds from the time of their transfer. I do not mean to say, that the evidence in the cause proves that I have assumed the right data for my calculation; but I do maintain, that it furnishes better ground for my calculation than the other.
I think that the chancellor did right in directing an issue, but the issue was too broad. It should not have been, whether the bond was given for an usurious consideration, but to ascertain the following facts: 1. At what time were the Ewell bonds transferred from Weaver to Grigsby ? 2. At what time was the loan of 1000 dollars made by Weaver to Grigsby 7 and 3. Of what sums was the bond of 23rd May 1817 compounded?
On the whole matter, I am of opinion, that the decree should be reversed with costs, and the cause remanded, with directions to set aside the verdict, and direct a new issue as above mentioned.
Decree affirmed.