174 So.2d 61 (1965)
SILVER SANDS OF PENSACOLA BEACH, INC., Frank E. Seidel and Dorothy S. Seidel, husband and wife, appellants,
v.
PENSACOLA LOAN & SAVINGS BANK, Appellee.
No. F-350.
District Court of Appeal of Florida. First District.
February 23, 1965.
On Rehearing April 29, 1965.
Levin, Askew & Warfield, Pensacola, for appellants.
Harrell, Caro, Middlebrooks & Wiltshire, Pensacola, for appellee.
RAWLS, Judge.
Defendants Mr. and Mrs. Seidel (joined by assignee Silver Sands) by this appeal *62 from a final decree of foreclosure in favor of the plaintiff bank contend that the bank charged them a usurious rate of interest at the outset.
Pensacola Loan & Savings Bank, a Morris Plan Bank, brought this action to foreclose a mortgage securing an indebtedness evidenced by a promissory note. The note recited a loan of $32,510.00 with interest at 8% per annum payable three years from date in installments of $560.00 per month for 36 months and one final payment of $12,350.00. Upon closing the loan, the bank deducted the sum of $7,510.00 in advance as interest, paid the sum of $100.77 for recording fee, intangible taxes and documentary stamps and disbursed to the borrowers (the Seidels) $25,000.00.
Defendant's defense of usury raised the only question urged on appeal: May a Morris Plan Bank or an Industrial Savings Bank under § 656.17, Florida Statutes, F.S.A., lend money and discount at the time of making the loan 8% of the principal for each year for a period of three years, notwithstanding that the principal amount of the loan is required to be repaid in installments?
A Vice President of plaintiff bank explained its calculation of interest as:
"We are eligible to deduct twenty-four percent from the face of the note, plus two percent of the amount of the principal. In this case we did not choose to charge Mr. Seidel a fee. He was not charged such a fee, even though the same was authorized. We wanted to charge him a rate less than eight percent discount, which is authorized by our statute, which we did."
The Chancellor in his Final Decree of Foreclosure found "that the rate of discount, as shown upon its face, and as established by the evidence at the Final Hearing, did not exceed 8% per annum, as permitted by § 656.17, Florida Statutes, F.S.A., and the Court further finds that the provisions of § 687.02, Florida Statutes, F.S.A., and § 687.03, Florida Statutes, F.S.A., having to do with usury, are not applicable to loans made upon discount by industrial banks, such as PENSACOLA LOAN & SAVINGS BANK."
The statute in question reads:
"656.17 Industrial savings banks in addition to the general and usual powers * * * shall have the following special powers, to-wit:
"(1) LOANS; SECURITY REQUIRED; INTEREST AND CHARGES.  The right to lend money upon the security of comakers, personal chattels or other property; and to take, receive, reserve and charge for such loans or discounts made or upon any notes, bills of exchange, or other evidences of debt, a discount not to exceed eight per cent per annum plus an additional charge not to exceed two per cent of the principal amount of any loan, which additional charge shall be for investigating the character of the individual applying for the loan, the security submitted and all other costs in connection with the making of such loans, all which charges and discounts may be collected at the time the loan is made. No other charge of any kind or nature whatsoever, by whatsoever purpose or name designated, shall be made; provided, however, that when a loan is of such character as to necessitate the filing or recording of a legal instrument, an additional charge may be made for such filing or recording, * * * also borrower may be required to pay abstract costs, reasonable attorney's fees, documentary stamp taxes, other taxes, premiums on insurance, and other similar charges, if the bank deems the same necessary for the protection and security of said loan.
* * * * * *
"(3) ACCEPT DEPOSITS AND ISSUE INVESTMENT CERTIFICATES, CONTRACTS, ETC.  The *63 right to accept deposits and issue as evidence therefor investment certificates, contracts or agreements, under any descriptive name which may bear such interest, if any, as their terms may provide and which may require the payment to the bank of such amounts from time to time as their terms may provide, and permit the withdrawal or cancellation of amounts paid upon the same in whole or in part from time to time and the credit of amounts thereon upon such condition as may be set forth therein.
"(4) PLANS ON WHICH LOANS MAY BE MADE.  The right to lend money on any combination of any of the foregoing plans or the elements thereof, including the right to lend money upon the collateral deposits of and the compliance of the borrowers with the terms of any deposit, investment certificate, contract or agreement issued under subsection (3) above."
The fact that the maximum 8% was not charged in the instant cause is immaterial since the interest charged, if not authorized by § 656.17, is  as both parties agree  in an amount which exceeds the 10% per annum allowed under the usury statutes.
Arthur J. Morris devised and put into operation in Norfolk, Virginia in 1910, the Morris Plan. Mr. Morris took advantage of Virginia court decisions which allowed banking institutions to charge expenses of investigation. Under his plan a bank could loan money at the Virginia legal rate of 6% interest but realize a yield to the bank of about 18% on the capital actually employed. So little publicity has been given this plan that many banking encyclopedias and text books neglect to mention Morris Plan Banks, or Industrial Banks as they are now called. From what information is available however, the original device used in Norfolk works in this manner. The bank would agree to lend a customer $100 payable in one year but the bank would deduct in advance the legal 6% interest plus an investigating fee of 2%. Before handing the customer the balance of $92.00, the bank would require him to sign a contract to buy a certificate of deposit for $100.00 on the installment plan, paying therefor $2 per week for 50 weeks with the understanding that the bank would accept the certificate in payment for the note when it became due. The device of crediting payments to a noninterest-bearing certificate was designed to disguise the increase in the true rate of interest. Since periodic payments in equal amounts reduce the average outstanding balance by one-half, the effect amounts to doubling the interest rate. By the use of the additional device of discounting the interest and investigating fee in advance, the bank could increase its total yield on the 6% loan to 17.7%. The original plan involved only small loans, averaging $200.00, for only one year. The deposit certificates were set up for repayment in 50 weeks, with no installment due on the first or last week of the loan period. Furthermore, it relied solely upon two or more endorsements as security for the loan.[1]
The Morris Plan gained acceptance because it was impossible for a bank to lend money in small amounts and collect payments in monthly or weekly installments for a charge of no more than 6%. The unavoidable expenses of such a business exceeded the legal rate of interest. Even at an effective interest rate of 18% Morris Plan Banks had to select their borrowers with great care, insisted on co-signers on all notes, and generally refused to make loans of less than $100.00. The legality of the plan lay in a technicality. Its essence consisted in not paying the loan in installments, *64 but instead, in making installment deposits in a separate account, which, when completed, was used to pay off the loan in one payment.[2]
By 1933 there were 108 Morris Plan Banks in 150 cities in 32 states. In 24 states special laws were needed and in two others the banks operated under the small loan laws. Although special law in some states permitted this type of loan up to $5,000, the average loan was slightly above $200.00.[3]
It is apparent that prior to the 1935 authorization of Morris Plan Banks, the Morris plan could not be legally used in Florida. The usury law[4] provided that it was unlawful
"* * * to reserve, charge or take for any loan, * * * a rate of interest greater than ten per cent per annum, either directly or indirectly, by way of commission for advances, discounts, exchange, or by any contract, contrivance or device whatever, whereby the debtor is required or obligated to pay a sum of money greater than the actual principal sum received, together with interest at the rate of ten per cent * * *." (Emphasis supplied)
In construing the usury law, the Florida Supreme Court had held in 1909[5] that even on a one year loan, discounting just the quarterly interest in advance is usury when such advance payment has the effect of causing the borrower to pay more than the 10% interest rate on the amount actually received. In 1932[6] the Supreme Court again stated that one was guilty of usury when by means of any contract, contrivance, or device whatever, the debtor is required or obligated to pay a sum of money greater "* * * than the actual principal sum received, together with interest at the rate of 10 per cent. per annum thereon * * *." (Emphasis supplied) In 1936 the Florida Supreme Court quoted with approval:[7]
"`The cupidity of lenders, and the willingness of borrowers to concede whatever may be demanded or to promise whatever may be exacted in order to obtain temporary relief from financial embarrassment, as would naturally be expected, have resulted in a great variety of devices to evade the usury laws; and to frustrate such evasions the courts have been compelled to look beyond the form of a transaction to its substance, and they have laid it down as an inflexible rule that the mere form is immaterial, but that it is the substance which must be considered.' 27 R.C.L. 211 § 12."
This court recently held in Atlas Subsidiaries of Florida, Inc. v. O. & O. Inc.[8] that it would penetrate any scheme constituting a sham or contrivance in evading the impact of Florida's usury laws. Thus, it is crystal clear that the judicial system of this state has consistently been strict in its construction of the language of the usury laws.
The purpose announced, the exacting language used, and the strict construction given to the Florida usury law, leaves little doubt that legislation was necessary to implement the Morris plan in Florida due to its three features, which increase the actual charge made for the loan  1. installment repayments, 2. the investigating fee, and 3. the discounting of interest. In contrast to the detailed wording of the usury law, the *65 Morris Plan Act, § 656.17, is worded in general language. If it can be construed as Plaintiff Bank contends it is generous to the banks involved beyond the wildest scheme conceived by Arthur J. Morris. It contains no maximum period for such loans, no maximum amount, and no limitation on the type of security required.
The title to the act shows a clear intent of the legislature to implement the Morris plan. Although Morris Plan Banks may still make loans subject to the restrictions of the usury laws or they may make loans pursuant to special powers enumerated in § 656.17, if such special powers are used, these banks are limited to those powers authorized, and the statute may not be used as a springboard for designing additional devices for further avoidance of the usury laws.
Subsection (1) of the statute in question liberalizes the usury law by legalizing to Morris Plan Banks the following procedures in making loans: 1. The right to discount interest not to exceed eight per cent per annum on the principal. 2. The right to charge and discount two per cent of the principal as an investigating fee. 3. The right to charge the borrower  in addition to the investigating fee  abstract costs, reasonable attorney's fees, documentary stamp taxes, other taxes, premiums on insurance, filing or recording fee, and other similar charges, and 4. The specific right to collect interest and the investigating fee at the time the loan is made. This subsection does not authorize repayment of the principal in installments. Had the legislature intended that the banks affected would have this additional privilege, it would have so provided.
Subsection (2) authorizes collection of the discount and all charges permitted in subsection (1) at the time the loan is made. Certainly, charges not permitted in (1) could not be collected at the time the loan is made. Therefore, this subsection must be read in the light of the words "The right to * * * charge * * * a discount not to exceed eight per cent per annum." All parties agree that the bank is authorized to deduct 8% interest plus the 2% fee plus other enumerated charges at the time of making a one year loan.
The Appellee Bank contends that subsections (3) through (5) authorize it to require installment payments upon the loan. We do not agree. Analysis of these subsections indicate that subsection (3) authorizes the bank to accept deposits and issue investment certificates requiring payments periodically in such amounts as the certificate may provide. These certificates may or may not bear interest and are not limited by a statutory maturity date. This subsection further states that the terms of the certificates may "* * * permit the withdrawal or cancellation of amounts paid upon the same in whole or in part from time to time and the credit of amounts thereon upon such condition as may be set forth therein." Subsection (4) provides "* * * the right to lend money upon the collateral deposits of and the compliance of the borrowers with the terms of any deposit * * *." There is no collateral deposit involved in the loan in question. However, it is noted that these subsections do not authorize the bank to require the borrower to make periodic payments on a loan, nor does it authorize the bank when crediting a loan to retain interest (when paid in advance) or to charge interest (when not paid in advance) for that portion of the principal as represented by the credit for the period of time from the date of the credit until the maturity date of the loan.
Subsection (5) authorizes a charge of 5 cents on a dollar for defaults in payment of periodic installments upon a certificate assigned as collateral for a loan. This subsection is consistent with the Morris plan which also charged a fine for delinquency in making periodic payments on the deposit certificates.
In the light of the foregoing, subsection (4) is self-explanatory.
*66 Mindful of the various procedures heretofore used to increase the yield on loans, we have found it extremely difficult to penetrate the legislative intent as expressed by F.S. 656.17, F.S.A. This Act could well be characterized as a model of vague and obscure language, talking out of both sides of the framer's mouth, and loaded with non-illuminating as well as useless phraseology that can hardly be said to serve any purpose other than to confuse the reader. For example: After purporting to specify all and singular the sort of discounts and charges that the lender may make, the borrower is given the heady wine of the following protection: "[n]o other charge of any kind or nature whatsoever, by whatsoever purpose or name designated, shall be made;" but at this point the framer had an inspiration and added: "provided, however, that when a loan is of such character as to necessitate the filing or recording of a legal instrument, an additional charge may be made for such filing or recording, providing such charge is actually paid to the proper public officials; also borrower may be required to pay abstract costs, reasonable attorney's fees, documentary stamp taxes, other taxes, premiums on insurance, and other similar charges, if the bank deems the same necessary for the protection and security of said loan." Selah.
We do not think it was the legislative intent to afford the lender the right to deduct in advance interest of 8% for a period exceeding one year from the date of the loan, and in addition to deduct a charge not to exceed 2% of the principal amount of the loan for investigating the character of the individual applying for the loan and the security submitted, and also to deduct all other enumerated costs in connection with the making of the loan. It is an elemental rule of statutory construction that a logical and practical intent should be ascribed to the legislative act. It is inconceivable that it was the legislative purpose to permit the lender, at the time of making the loan and in the absence of any limitation upon the period of maturity of the loan, to deduct from the principal thereof successive items equivalent to 8% of the principal for each year of the life of the loan. First grade mathematics would quickly reveal that when applying such procedure to a loan extending beyond a period of 13 years, the borrower would need to come to the lender with cash in hand in order to consummate the loan.
In construing the words "The right to * * * charge * * * a discount not to exceed eight per cent per annum", we are compelled to adhere to the common usage given the words "discount" and "per annum" since the same are not defined by statute. "Discount" means "the taking of interest in advance" and "per annum" means "by the year".[9] Thus, the bank may charge a discount of 8% by the year. That is, it may charge annually at the beginning of each year that interest which would accrue during the year, and so it may deduct at the time of making the loan the interest for the first year. To adopt a construction that would permit the bank to deduct at the time of making the loan that interest which would accrue 10 years hence, in case of a 10 year loan, would do violence to the statute since it results in an exorbitant true interest rate on the capital actually employed and a discount rate in excess of 8%. Had the legislature intended any other construction there would have been no purpose for including in the statute the words "not to exceed". This is true because the actual discount rate would fluctuate depending upon *67 the length of the loan. Subsection (1) simply permits affected banks to do that which they could not otherwise have done, that is, deduct in advance aggregate charges of 10%.[10]
This position is consistent with the apparent intent of the 1935 Legislature to authorize certain banks to make loans according to the Morris Plan. Furthermore, this construction is not inconsistent with the provision in subsection (1) of the Act reading: "* * * all which charges and discounts [there being two  the 8% and the 2%] may be collected at the time the loan is made." Nor is it inconsistent with subsection (2) which grants the "* * * right to require payment of the discount and charges permitted in subsection (1) above at the time the loan is made." In reaching this decision we are cognizant that through the years our usury laws and special statutes, such as the one herein construed, have granted interest rates more liberal than those of many of our sister states, but at the same time our courts have consistently held to a strict construction and have been quick to penetrate contrivances or devices not authorized or contemplated in the statutes.
Appellee has cited no cases, nor has our research revealed any, in which discount is computed as the Bank contends on long term loans. On the contrary, the practice of deducting discount at the time of making the loan is apparently limited to short term loans for a period of one year or less.[11]
As previously noted, the subject statute does not authorize the bank to require the borrower to repay the loan in periodic installments as does the terms of the Siedel note. Such loan transactions are regulated by the usury laws in Chapter 687. Therefore, we conclude that the loan in question exceeded the authorization of the statute with respect to the method of computing the discount taken at the time of making the loan and with respect to the required periodic payments on the loan. Since the Pensacola Loan & Savings Bank did not make the loan in terms which comply with its special powers, the loan is subject to the terms of the usury laws.
Reversed and remanded for further proceedings consistent herewith.
CARROLL, DONALD K., J., concurs.
WIGGINTON, Acting C.J., dissents.
WIGGINTON, Judge (concurring in part, dissenting in part).
While I am in complete agreement with one phrase of the able majority opinion written by my brother RAWLS, I find myself in the regrettable position of being unable to agree on the remaining phase of the case.
The statute under which the loan in controversy was made relates solely to Industrial Banks chartered in Florida. The statute purports to confer special powers on this type of lending institution. Under the statute an Industrial Bank may loan money and discount the loan at a rate not exceeding eight per cent per annum.[1] As *68 noted in the majority opinion, the statute does not expressly place any limitation upon loans made by Industrial Banks either with respect to amount or time. I am unable to read into the statute an implied limitation of one year on loans which an Industrial Bank is authorized to make and collect the discount in advance.
From the testimony adduced at the trial of this cause it appears that the customary method of computing interest charged by Industrial Banks on loans made under this chapter is to multiply the numeral eight (eight per cent per annum being the maximum amount of interest which may be charged on the loan) by the number of years the loan is intended to run, thereby producing the percentage of the total loan which may be discounted as interest and deducted from the loan at the time it is made. Loans discounted in this manner no doubt can and in some instances do result in interest charges which appear to be exorbitant. As alluded to in the majority opinion, the face amount of a ten-year loan made under this statute would be discounted by eighty per cent thereof, and that amount taken from the loan at the time it is made, the borrower receiving only the remaining twenty per cent. Even though only such a small amount of the loan would be paid over to the borrower at the time the loan is closed, he would be obligated to repay to the bank at the end of the ten-year period the entire full face amount of the loan. I hasten to point out, however, that such a loan arrangement was permitted at common law, and would be permitted under the laws of Florida today, irrespective of Chapter 656 relating to Industrial Banks, unless prohibited by our statutes relating to usury.[2] The chapter regulating interest and usury specifically provides that it shall not be construed to apply to loans made in conformity with special statutes governing Industrial and Morris Plan Banks.[3] If the normal operation of an Industrial Bank under the statute conferring upon it special powers permits it to make interest charges considered to be exorbitant, the remedy lies with the legislature in the exercise of its exclusive powers of amendment and repeal.
I am in full accord with that part of the majority opinion which holds that an Industrial Bank may not discount a loan at the rate of eight per cent per annum, if the terms of the loan require that it be repaid in periodic installments. I perceive no provision of this statute which permits such a loan arrangement. If an Industrial Bank elects to get into the business of making loans repayable in periodic installments, the amount of interest it may charge and discount is regulated by our general laws relating to usury as set forth in Chapter 687. The loan now under consideration produces an interest rate in excess of that permitted by the usury statute, and being unauthorized by F.S. Section 656.17, F.S.A., it should not be approved.

*69 ON PETITION FOR REHEARING
RAWLS, Judge.
Petitioner Pensacola Loan & Savings Bank has presented two points in its petition for rehearing which we find are entitled to further consideration, viz.: 1. This Court erred in holding that the total interest for the entire period of the loan could not be discounted at the time of making the loan, and 2. Our opinion is ambiguous as to periodic repayments.
As to the first point, petitioner contends that this question was not presented on appeal and disposition thereof was not necessary for a final determination in this case. We agree and hereby recede from that portion of our opinion which held that interest could be discounted for only one year at the time.
Although our former opinion in this case had reference to only one subject, the computation of interest for loans made under § 656.17, Florida Statutes, F.S.A., some sentences when abstracted from the whole opinion do seemingly limit the manner of repayment. To clarify that matter, we reiterate here that loans made under the authority of § 656.17 are not limited to any designated period of time nor to any particular manner of repayment. However, that statute does not specifically authorize Industrial Banks to charge interest or to discount interest without taking into consideration payments credited to the loan principal. We held, and herein affirm, that such a loan by its terms may require installment payments, but in computing interest for any purpose, including the purpose of computing the discount, repayment of the principal by installments must be taken into consideration. Save as so modified, we adhere to the opinion in this cause.
WIGGINTON, Acting C.J., and CARROLL, DONALD K., J., concur.
NOTES
[1] Milan V. Ayres, INSTALMENT MATHEMATICS HANDBOOK, pp. 141, 142; 1946; Robinson and Nugent, REGULATION OF THE SMALL LOAN BUSINESS, 1935, pp. 90, 93; Prochnow, AMERICAN FINANCIAL INSTITUTIONS, 1951, pp. 731-734; Encyclopedia Americana, Vol. 19, pp. 479, 480.
[2] Milan V. Ayres, Ibid.
[3] Encyclopedia of Social Sciences, Vol. XIV, Small Loans, pp. 109, 110.
[4] § 687.03, Florida Statutes, F.S.A.
[5] Purvis v. Frink, 57 Fla. 519, 49 So. 1023 (1909).
[6] Wilson v. Conner, 106 Fla. 6, 142 So. 606, 608 (1932).
[7] Beacham v. Carr, 122 Fla. 736, 166 So. 456, 459 (1936).
[8] Atlas Subsidiaries of Florida, Inc. v. O. & O. Inc., 166 So.2d 458 (Fla.App.1st, 1964).
[9] Black's Law Dictionary, 3 Ed.; Fleckner v. Bank of United States, 8 Wheat. 338, 353, 5 L.Ed. 631, 635, defined "discount" as "* * * authority to take the interest in advance", and stated, "* * * this is not only the settled opinion among professional and commercial men, but stands approved by the soundest principles of legal construction." Learned Hand in In re Worth Lighting & Fixture Co., 292 F. 769 (S.D.N.Y., 1923) said, "[d]iscounting is getting the present value of the debt; i.e., its face, less interest."
[10] See Purvis v. Frink, supra.
[11] 91 C.J.S. Usury § 34 and Evans v. National Bank of Savanna, 251 U.S. 108, 40 S.Ct. 58, 64 L.Ed. 171 (1919). In Evans the National Bank Act authorized discounting but set no statutory maturity date for such loans. It was held that discounting "short-time paper" at the highest interest rate allowed by law was not usurious.
[1] "Special Powers

"Industrial savings banks in addition to the general and usual powers incidental to ordinary corporations for profit in this state, which are not specifically restricted in this law, shall have the following special powers, to-wit:
"(1) Loans; security required, interest and charges.  The right to lend money upon the security of comakers, personal chattels or other property; and to take, receive, reserve and charge for such loans or discounts made or upon any notes, bills of exchange, or other evidences of debt, a discount not to exceed eight per cent per annum plus an additional charge not to exceed two per cent of the principal amount of any loan, which additional charge shall be for investigating the character of the individual applying for the loan, the security submitted and all other costs in connection with the making of such loan, all which charges and discounts may be collected at the time the loan is made. No other charge of any kind or nature whatsoever, by whatsoever purpose or name designated, shall be made; provided, however, that when a loan is of such character as to necessitate the filing or recording of a legal instrument, an additional charge may be made for such filing or recording, providing such charge is actually paid to the proper public officials; also borrower may be required to pay abstract costs, reasonable attorney's fees, documentary stamp taxes, other taxes, premiums on insurance, and other similar charges, if the bank deems the same necessary for the protection and security of said loan. * * *" F.S. § 656.17, F.S.A.
[2] F.S. §§ 687.01, 687.02, F.S.A.
[3] F.S. § 687.031, F.S.A.