**FIRST NATIONAL BANK IN MENA, Appellant, Cross-Appellee,**

v.

**Jack A. NOWLIN, Appellee, Cross-Appellant.**

**Nos. 74–1397 and 74–1427.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1974.

Decided Jan. 17, 1975.

**874**

C. J. Giroir, Jr., Little Rock, Ark., for appellant, cross-appellee.

Jerry D. Jackson, Little Rock, Ark., for appellee, cross-appellant.

Before GIBSON, Chief Judge, CLARK, Associate Justice, Retired,* and WEBSTER, Circuit Judge.

GIBSON, Chief Judge.

 Is a note which is usurious under state law also usurious when made to a national bank? With the limited exception of a short-term single payment note, we think it is. The central issue presented by this litigation is whether the National Bank Act, 12 U.S.C. § 21 *et seq.*, permits a national bank in Arkansas to reserve interest in advance on installment loans calculated at a numerical rate not in excess of the statutory Arkansas usury limits but yielding an effective rate of return substantially in excess of the state limit.

The First National Bank in Mena (Bank), Mena, Arkansas, an association organized and operating pursuant to the National Bank Act, appeals from a judgment of the District Court[1] finding two installment notes usurious and granting the bank recovery only on the principal of the notes and denying recovery of any interest. The debtor defendant, Jack A. Nowlin, cross-appeals, seeking more extensive relief in the form of forfeiture of the principal due on the notes or, in the alternative, recovery of double the interest reserved on the notes.

In this diversity action the Bank sought declaratory relief and a money judgment for principal and interest due it as payee on the two notes executed January 11, 1974, by Nowlin, a Tennessee citizen. One note evidenced an installment loan of $11,000 payable in twelve equal monthly installments, from which the bank had discounted 8% annual interest, thus making an effective yield of 16.05% per annum; the other evidenced a $2,000 loan payable in thirty-six equal monthly installments to which the bank had added 8% interest in advance, raising the face of the note to $2,480, resulting in an effective interest rate of 15.57%.

Nowlin made no payments and renounced his obligations by letters dated January 15, 1974, claiming both notes were usurious and void under Arkansas law. After the Bank accelerated both notes and filed suit, Nowlin counterclaimed for forfeiture of both the principal of the notes and interest as provided by Arkansas law, or a penalty of twice the amount of interest paid, pursuant to the sanctions of 12 U.S.C. § 86 (1970).

The District Court in this non-jury trial determined that if these installment

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

1. A memorandum opinion filed by the Honorable J. Smith Henley, Chief Judge, United States District Court for the Eastern District of Arkansas, is reported at 374 F.Supp. 1037 (E.D.Ark.1974).

loans yielding in excess of 10% annually had been made by any Arkansas lender other than a national bank, they would have been usurious under the Arkansas constitution and Arkansas cases construing the constitutional provision. The court further held that because the purpose of 12 U.S.C. § 85 (1970) is to permit national banks to charge as much, but no more, interest than the most favored lenders operating under state laws, a loan by a national bank is usurious under federal law if usurious under state law were it made by such a favored state lender. Consequently, the court held that both Nowlin notes were usurious and thus void with respect to interest but not principal. Nowlin's counterclaim under § 86 was denied because he had not in fact paid any interest. The Bank does not contest that the loans, as evidenced by the notes, would be usurious if made by any lender operating solely under state law.

Under 12 U.S.C. § 85, (1970), national banks may charge "interest at the rate allowed by the laws of the State * * * where the bank is located * * * and no more * * *." [2] The penalty under 12 U.S.C. § 86 for knowingly charging a rate of interest greater than allowed by law is a forfeiture of the entire interest where the interest has not been paid and a penalty of double the amount of interest if it actually has been paid on the usurious loan.[3]

■ The pertinent Arkansas law incorporated by reference in § 85 is a constitutional provision restricting interest rates to an amount not greater than 10% per annum,[4] and the statutory law implementing that constitutional provision setting the maximum state interest rate at 10% per annum.[5] Other state statutory provisions prohibit usurious interest and make all notes and evidence of indebtedness or contracts violative of the usury prohibition void.[6] The test for as-

---

2. The federal statutes in question, derived from § 30 of the National Bank Act of 1864 and from Rev.Stats. §§ 5197 and 5198 (1875) without material change for purposes of this case, are now codified at 12 U.S.C. §§ 85 (1970) and 86. Section 85 states in relevant part:

 *Rate of interest on loans, discounts and purchases*
 Any association may take, receive, reserve, and charge on any loan or discount * * * or other evidences of debt, interest at the rate allowed by the laws of the State * * * where the bank is located * * * and no more * * *.

 The alternative rate of one percent in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve Bank permitted by the same statute is not pertinent to the issues in this case.

3. 12 U.S.C. § 86 (1970) reads:

 *Usurious interest; penalty for taking; limitations*
 The taking, receiving, reserving, or charging [of] a rate of interest greater than is allowed by the preceding section, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it * * *. In case the greater rate of interest has been paid, the person by whom it has been paid * * * may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid * * *.

4. Ark.Const. art. 19, § 13 reads:

 *Usury—Legal Rate.*—All contracts for a greater rate of interest than ten percent per annum shall be void, as to principal and interest, and the General Assembly shall prohibit the same by law; but when no rate of interest is agreed upon, the rate shall be six per centum per annum.

5. Ark.Stat.Ann. § 68–602 (1957 repl.) reads:

 *Maximum rate of interest by contract.*— The parties to any contract, whether the same be under seal or not, may agree in writing for the payment of interest not exceeding ten per centum * * * per annum on money due or to become due.

6. These applicable state statutory provisions read:

 § 68–603 *Usurious interest prohibited.*— No person or corporation shall, directly or indirectly, take or receive in money, goods, things in action, or any other valuable thing, any greater sum or value for the loan or forbearance of money or goods, things in action, or any other valuable thing, than is in section one [§ 68–602] of this act prescribed.

 * * * * * *

 § 68–608 *Bonds, bills and notes, conveyances, contracts or securities void when interest excessive.*—All bonds, bills, notes, assurances, conveyances, and all other contracts or securities whatever, whereupon or

certaining whether a loan or transaction is usurious in Arkansas is a simple one of comparing the amount the borrower is required to pay with the total amount he could be required to pay at the maximum rate of interest (10%), figured at simple interest per annum for the term.[7]

## I. The Bank's Appeal.

■ The Bank contends that the term "rate" of interest "allowed by the laws of the State," as used in 12 U.S.C. § 85 should be construed not to apply the maximum "effective rate" or "yield" allowed by state law, but rather merely to incorporate the numerical rate permitted the most favored state lender, as it appears in the state statutes, applying it on a discount basis without taking notice of the state's cases construing those statutes. The Bank does not dispute that lenders under Arkansas law are prohibited from adding-on or discounting interest to increase the yield on installment notes above the 10% limit. It argues, however, that the 1919 Supreme Court decision in Evans v. National Bank, 251 U.S. 108, 40 S.Ct. 58, 64 L.Ed. 171 (1919), permits national banks to discount loans at the maximum state rate without regard to state prohibitions on discounting which prevent yields in excess of the maximum state rate.

■■ We think that determination of the "rate allowed by the laws of the State" can only be accomplished with reference to state court interpretations of the state's own constitution and statutes. The primary principle of construction of 12 U.S.C. § 85, to which Evans might be considered a narrow exception, is that the federal Act adopts the entire case law of the state interpreting the state's limitations on usury; it does not merely incorporate the numerical rate adopted by the state. Citizens' National

Bank v. Donnell, 195 U.S. 369, 374, 24 S.Ct. 49, 49 L.Ed. 238 (1904); Daggs v. Phoenix National Bank, 177 U.S. 549, 555, 20 S.Ct. 732, 44 L.Ed. 882 (1900). As expressed by Mr. Justice McKenna for a unanimous court in Daggs:

> The intention of the national law is to adopt the state law, and permit to national banks what the state law allows to its citizens and to the banks organized by it. Tiffany v. National Bank of Missouri, [85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1873)].

Daggs, supra at 555, 20 S.Ct. at 735.

The rationale of Evans, based on the long standing mercantile practice of discounting short-term single payment commercial paper, should not now be extended to permit usurious discounting practices on installment notes. While many question the soundness of the Evans 6–3 holding and feel that Mr. Justice Pitney's dissent, concurred in by Justices Brandeis and Clarke, presents a more rational view, we cannot overrule Evans, but we do feel that Evans should be confined to its own facts of single payment short-term paper. To extend Evans' rationale, as the Bank urges, in order to allow discounting of installment paper would be to extend it to a materially different factual situation and into a new economic setting.

Installment credit as it is extended and utilized today was for all practical purposes nonexistent at the time of Evans. The discounting of short-term single payment commercial paper, however, was a prevalent and widespread practice at that time and has continued to the present time. The now common practice of lending on installment paper of varying terms, including long-terms, and of figuring the interest rate on a discount basis is of fairly recent origin. The

---

whereby there shall be reserved, taken or secured, or agreed to be taken or reserved, any greater sum, or greater value for the loan or forbearance of any money, goods, things in action, or any other valuable thing than is prescribed in this act * * * shall be void.

7. Davidson v. Commercial Credit Equip. Corp., 255 Ark. 127, 499 S.W.2d 68, 70–71

(1973). In Arkansas the term "rate," therefore, is to be read as "effective yield."

Prior to 1952 the test for determining usury was not so simple. See, e. g., Strickler v. State Auto Finance Co., 220 Ark. 565, 249 S.W.2d 307, 310–311 (1952). See generally Sloan v. Sears, Roebuck & Co., 228 Ark. 464, 308 S.W.2d 802, 804–805 (1958).

practice has only become widespread with the advent of consumer credit, making almost anyone without an extremely dismal credit record eligible to purchase almost any item or service on a comparatively long-term installment credit basis. This practice has only recently found widespread acceptance, increasingly so in the last two decades.

*Evans* was a 1919 lawsuit by receivers of a state bank to recover the federal usury penalty from a national bank lender which had reserved interest in advance at 8%, the maximum rate permitted in Georgia, to achieve a slightly higher effective yield. Each loan was paid at maturity. The Supreme Court affirmed judgment on the pleadings for the defendant national bank, holding that by discounting "short-time" notes at the maximum 8% rate allowed by Georgia statute, the national bank did not act usuriously under the federal statute. The majority of the Court took note of, but chose not to follow, the current Georgia court-made rule [8] which prohibited the taking of interest in advance at the maximum rate because it inevitably increased the effective yield above the 8% limit. The unsuccessful plaintiff in *Evans* argued, as does Nowlin in the instant case, that the federal statute applied the same usury rule to national banks as Georgia law applied to individuals and state banks.

The *Evans'* Court majority disagreed, however, relying upon Fleckner v. Bank of the United States, 21 U.S. (8 Wheat.) 338, 354, 5 L.Ed. 631 (1823),[9] and a line of American and English authorities, recognizing that the discounting of "short-time" commercial paper in the ordinary course of business was a long settled commercial tradition, and concluding that doing so at the maximum state rate

could therefore not be usurious. 251 U.S. at 113–114, 40 S.Ct. 58, 64 L.Ed. 171. The majority reasoned that because "Congress intended to endow national banks with the power * * * of discounting notes reserving charges at the highest rate permitted for interest," federal law empowers the national bank in Georgia to retain interest at the maximum 8% allowed by Georgia statute, "referring to the state law only to determine the maximum permitted rate," not to determine the proper means for calculating that rate. 251 U.S. at 114, 40 S.Ct. at 60.

However, in his well-reasoned dissent in *Evans,* Mr. Justice Pitney argued that the federal courts, in determining the maximum interest rate "allowed by the laws of the State," must consider not only the multiplier figure but all state cases interpreting and construing the state statute which might reveal the proper arithmetical use of that figure.[10] Specifically, he stated:

> The section has regard to substance, not merely to form; and in determining what is in substance the local rate of interest it is fallacious, I submit, to regard the multiplier only (say, 8 per cent.), and ignore the multiplicand, since both factors have equal influence in producing the result. As in other cases of testing state laws by a federal standard, the question is, what is the effect and operation of those laws, as construed and applied by the state court of last resort? *Evans, supra,* 251 U.S. at 118, 40 S.Ct. at 61.

In conclusion, quoting from Mr. Justice Holmes speaking for the Court in Citizens' National Bank v. Donnell, 195 U.S. 369, 373–374, 25 S.Ct. 49, 49 L.Ed. 238 (1904), Mr. Justice Pitney stated that in

---

8. Loganville Banking Co. v. Forrester, 143 Ga. 302, 84 S.E. 961 (1915).

9. *Fleckner* is not a sound precedent for a usury case, as the rate limitation of 6% was imposed in the federal charter of United States Banks, and a violation of the limit at best constitutes a charter violation of which only the Government might complain.

10. Citing Farmers' & Mechanics' Nat'l Bank v. Dearing, 91 U.S. 29, 32, 23 L.Ed. 196 (1875); Union Nat'l Bank v. Louisville, N.A., & C. Ry., 163 U.S. 325, 331, 16 S.Ct. 1039, 41 L.Ed. 177 (1896); Haseltine v. Central Bank, 183 U.S. 132, 134, 22 S.Ct. 49, 46 L.Ed. 118 (1901).

applying the National Bank Act "on the question whether what was done amounted to * * * [usury] within the meaning of the [state] statute, we follow the state court"; therefore, given the existing Georgia court rule, the national bank in *Evans* "charged more than 'interest at the rate allowed by the laws of the State.'" 251 U.S. at 120, 40 S.Ct. at 62.[11]

The *Evans* case dealt with "short-time" single payment notes. The 1823 *Fleckner* case, a bank charter violation case, upon which the *Evans* majority relied, dealt with a single payment 23-month note of $10,000. The Court's holding in *Evans* that the practice of discounting is not usurious even if it raises the effective yield above the state ceiling, is based essentially on the Court's recognition that discounting on single payment commercial paper was then widely practiced.[12] It is widely practiced on *short-term single payment*

paper as well today, *i. e.,* United States Treasury Bills of 90 days, 180 days, and one year duration. It is doubtful, however, that the Supreme Court would as readily hold the discounting of *installment* paper by a national bank to be as acceptable today, 150 years after *Fleckner,* in view of the enhanced economic impact of discounting installment paper as compared to short-term single payment paper and the obvious discrimination in allowing national banks to charge almost double the effective rate charged by state financial institutions.[13] What affects the borrower's pocketbook is the effective rate, not semantics dealing with figures.

The Bank's reliance on Northway Lanes v. Hackley Union National Bank & Trust Co., 464 F.2d 855 (6th Cir. 1972), is not persuasive for two reasons. First, for reasons stated above, we disagree with the Sixth Circuit's extension of *Evans* and *Fleckner* as its basis for approv-

11. In Citizens' Nat'l Bank v. Donnell, *supra,* fifteen years before *Evans,* the Court held interest on a loan forfeited under the federal statute because the national bank compounded it "oftener than once in a year" in violation of state law, in spite of the fact that the rate of interest charged by the bank, even compounded, was below the 8% state rate.

12. The *Evans* Court's long quotation of dictum from Fleckner v. Bank of the United States, 21 U.S. (8 Wheat.) 338, 354, 5 L.Ed. 631 (1823), supports this conclusion:

> [T]his court, through Mr. Justice Story, said: "If a transaction of this sort [discounting a single payment 2 year note at the maximum 6% nominal rate] is to be deemed usurious, the same principle must apply with equal force to bank discounts, generally, for the practice is believed to be universal; and, probably, few, if any, charters, contain an express provision, authorizing, in terms, the deduction of the interest in advance upon making loans or discounts. It has always been supposed, that an authority to discount, or make discounts, did, from the very force of the terms, necessarily include an authority to take the interest in advance. And this is not only the settled opinion among professional and commercial men, but stands approved by the soundest principles of legal construction. Indeed, we do not know in what other sense the word 'discount' is to be interpreted. Even in England, where no statute authorizes bankers to make discounts, it has

> been solemnly adjudged, that the taking of interest in advance by bankers, upon loans, in the ordinary course of business, is not usurious." 251 U.S. at 113, 40 S.Ct. at 59.

The plaintiff bank's reliance on Bank of Newport v. Cook, 60 Ark. 288, 30 S.W. 35 (1895), cited by the *Evans* majority as well, is likewise misplaced for the same reason as its reliance on *Evans.* Both cases dealt with single payment, not installment, obligations discounted in the ordinary course of business. Moreover, recent Arkansas cases apply the usury laws more strictly than did those in prior years. See note 7, *supra.*

13. As an example, a $1,000 single payment one-year note discounted at 8% yields 8.70%. The same note yields 16.05% if principal and interest are repaid in twelve monthly installments. The increase in yield is almost as substantial when the interest is added-on in advance rather than discounted. *See* American Book of Simple Interest Yields 6, 14, 35 (1958).

The inherent vice in discounting is readily apparent when carried to its extreme. A $10,000 ten year installment note at 10% interest would leave the maker zero dollars and the ten year discount at 10% would make the discount $10,000, equal to the face of the note. As noted by an early English case, "if the practice [of discounting] be carried to a great length, the interest will annihilate the principal." Lord Alvanley, quoted in Bank of Newport v. Cook, 60 Ark. 288, 299, 30 S.W. 35, 38 (1895) (Battle, J. dissenting).

ing the Michigan national bank's reservation of interest in advance on a five-year 7% chattel mortgage installment note with an effective annual yield of approximately 13½%. Michigan's limit on commercial mortgages and industrial discount or add-on loans was apparently 7%.[14] The *Northway* court relied upon *Fleckner* and *Evans* for the proposition that the taking of interest in advance at the maximum rate, when discounting a note at a bank, is not usurious. 464 F.2d at 860. Quoting the *Evans* Court's statement that discounting is an "ancient and commonly accepted doctrine," the Sixth Circuit affirmed a judgment for the national bank denying the debtor its 12 U.S.C. § 86 statutory penalty without distinguishing between the historically accepted practice of discounting "short-time" *single payment* commercial paper and reserving advance interest on *installment* notes. We believe the vast difference between the actual interest charged in discounting installment paper over that charged in discounting short-term single payment notes precludes such a smooth extension of *Evans*. Although the national bank's "right to charge interest in advance arises independent of state laws", *Northway, supra* at 860–861 of 464 F.2d, that independence is necessarily limited by the Act's adoption of the state's law, including its case law, to set the maximum rate. While the validity of the legislative history relied on in *Northway* has been questioned, we need not face that debatable issue in this appeal.[15]

Second, the *Northway* case is distinguishable from the instant case in that the reservation of interest in advance at the maximum statutory rate by the national bank in that case was not so clearly prohibited by Michigan law as is the instant practice by Arkansas law, the court utilizing the most favored lender doctrine created in Tiffany v. National Bank, 85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1873), to find the interest and other charges permissible under state law.

A construction of 12 U.S.C. § 85 which takes full notice of the state's case law is consistent with the Act's legislative history. The Act reflects a congressional compromise giving national banks full and complete parity of interest rate regulation with state banks while guarding against unfriendly anti-federal state legislation or ruinous competition with state banks.[16] Speaking with respect to a prior unsuccessful proposed version of the legislation, Senator Sherman, a principal supporter of national bank interests, stated:

> I prefer now to place the national banks in each state on precisely the same footing with individuals and persons doing business in the State by its own laws.[17]

The policy of the pro-national bank faction in Congress in fashioning the Act was to place national banks in a position of limited advantage over state banks by allowing them to charge interest at the highest rate applicable under state law to lenders generally in each respective state, not necessarily at the rate applicable to state banks which might be lower. While it has been questioned whether Congress in the final version of the Act actually intended to adopt the policy of giving national banks most favored lender status rather than parity with state banks,[18], it has been established in the

---

**14.** *Northway, supra,* 464 F.2d at 857 n. 2, citing Mich.Stat.Ann. Section 19.15(1), Mich. Comp.Laws Ann. § 438.31; and Mich.Stat. Ann. Section 23.766, Mich.Comp.Laws Ann. § 487.38.

**15.** See Comment, 58 Iowa L.Rev. 1240, 1265–66 (1973). This comment suggests with documentation that Tiffany v. Nat'l Bank, 85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1873), and cases such as *Northway* following it find no support in, and directly oppose, the policy of strict

national and state bank interest rate parity enunciated in the legislative history of the 1864 Act.

**16.** *See* Cong.Globe, 38th Cong., 1st Sess. 2123–45 (1864).

**17.** *Id.* at 2126.

**18.** See Comment, 58 Iowa L.Rev. 1250, 1265–66 (1973).

Two congressional factions of roughly equal power debated the wording of the original

law since Tiffany v. National Bank, *supra*. The most favored lender policy has not, however, been extended to give national banks superiority over all state lenders, corporate and individual, including banks, as is contended by the Bank in the instant case.

█ Further support for construing 12 U.S.C. § 85 so as to incorporate the state's interpretation of its own law can be found in Union National Bank v. Louisville, N.A. & C. Ry., 163 U.S. 325, 331, 16 S.Ct. 1039, 41 L.Ed. 177 (1896), cited by the *Evans* dissenters,[19] and in the Supreme Court's recognition of a general policy of state-federal equalization and "competitive equality" under various twentieth century amendments to the Act in different but related contexts. For example, as Mr. Justice Clark stated for the Court in First National Bank v. Walker Bank & Trust Co., 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343 (1966):

> It appears clear from this résumé of the legislative history of [12 U.S.C.]

Act. One side sought to prevent national banks from charging higher rates than state banks and thereby gaining a major competitive advantage. The other faction sought to prevent states from passing interest rate legislation hostile to national banks by means such as enacting a "general" low state rate applicable to national banks and then exempting state banks, permitting them to charge more. The apparent product of the compromise as it appears in today's Act is the exception that "where by the laws of any State a *different* rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter." 12 U.S.C. § 85 (emphasis added).

The cases since *Tiffany, supra*, have interpreted the term "different" as referring only to a different *higher* rate of interest, thus permitting the national banks to charge as much as the most favored lenders operating under state law and granting virtual after-the-fact victory to the pro-national bank congressional faction. Another interpretation might be that "different" refers to a *higher or lower* rate. National banks would thus be paired with state banks even at a different *lower* state rate than that applicable to most fa-

§ 36(c)(1) and (2) that Congress intended to place national and state banks on a basis of "competitive equality" insofar as branch banking was concerned. * * * To us it appears beyond question that the Congress was continuing its policy of equalization first adopted in the National Bank Act of 1864. (citations omitted.)[20]

The policy of competitive state-federal equality in the context of usury regulation is supported by the District Court's construction of § 85 which imposes the same interest ceiling on national banks as on the most favored lenders in the state, and thereby puts national banks on an equal footing with the most favored lenders in the state without giving them an unconscionable and destructive advantage over all state lenders. Whether the state banks will enjoy parity in interest regulation with national banks is thus left to the states to decide. The federal statute merely prevents state legislation which purports to give state banks or possibly any state lender advantages over national banks.

vored lenders. This construction, however, has apparently not received judicial recognition in any usury case.

19. *Union National* construed the Act as giving national banks "a right to have an equal administration of the rule established by state law." 163 U.S. at 331, 16 S.Ct. at 1042. *See also* Partain v. First Nat'l Bank, 467 F.2d 167, 173–174 (5th Cir. 1972); American Timber & Trading Co. v. First Nat'l Bank, 334 F.Supp. 888, 889 (D.Or.1971).

20. Furthering the theme of "competitive equality" in First Nat'l Bank v. Dickinson, 396 U.S. 122, 133, 90 S.Ct. 337, 343, 24 L.Ed.2d 312 (1969), upholding Florida's prohibition of a national bank's offsite depository and armored car pick up service as violative of the state's branch banking regulations, as adopted and applied through 12 U.S.C. § 36(f), the Court recently stated:

> The policy of competitive equality is therefore firmly embedded in the statutes governing the national banking system. The mechanism of referring to state law is simply one designed to implement that congressional intent and build into the federal statute a self-executing provision to accommodate to changes in state regulation.

*II. Nowlin's Cross-Appeal.*

■ Nowlin argues, admittedly against the weight of authority, *see, e. g.,* McCollum v. Hamilton National Bank, 303 U.S. 245, 248, 58 S.Ct. 568, 82 L.Ed. 819 (1938), that national banks should be subject to state [21] rather than federal penalties for usury. *Evans* categorically held that penalties for usury committed by a national bank are governed by the National Bank Act. 251 U.S. at 109, 40 S.Ct. 58. To hold otherwise in the instant case would jeopardize the national banking system by allowing the states to set penalties for violations of federal law. That is patently contrary to the congressional policy of assuring national banks parity with state banks and most favored state lenders. Furthermore, since Congress has provided a penalty for usury, that action preempts the field and leaves no room for varying state penalties.

■ Alternatively, Nowlin argues that he, at least, is entitled to the federal penalty of double the interest paid because he actually "paid" the interest when it was reserved by the Bank in advance and added to the face of the note. A reading of § 86, however, indicates that actual payment of usurious interest is required in order for a debtor to qualify for the federal interest penalty of double the amount of interest paid. McCarthy v. First National Bank, 223 U.S. 493, 499, 223 U.S. 493, 56 L.Ed. 523 (1912).

The District Court properly granted the Bank judgment against Nowlin for the amount of loan principal which Nowlin actually received and forfeited any interest due thereon. Defendant Nowlin is entitled to no further penalty. 12 U.S.C. § 86; Haseltine v. Central Bank, 183 U.S. 132, 135, 22 S.Ct. 49, 46 L.Ed. 117 (1901).

The judgment of the District Court is affirmed. Costs are to be assessed ¾ against the plaintiff Bank and ¼ against defendant Nowlin.

---

21. Ark.Const. art. 19, § 13, would render the loans void as to principal as well as interest.