The MARQUETTE NATIONAL BANK OF MINNEAPOLIS, Respondent,

v.

FIRST OF OMAHA SERVICE CORPORATION, Appellant,

and

State of Minnesota, Intervenor, Respondent.

No. 47561.

Supreme Court of Minnesota.

Nov. 10, 1977.

Rehearing Denied Dec. 8, 1977.

Mackall, Crounse & Moore, Clay R. Moore, Minneapolis, Swarr May, Smith & Andersen, William E. Morrow, Jr., and Donald J. Buresh, Omaha, Neb., for appellant.

Levitt, Palmer, Bowen, Bearmon & Rotman and John Troyer and J. Patrick McDavitt, Minneapolis, for Marquette Nat. Bank.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Thomas R. Muck, Asst. Atty. Gen., Stephen Shakman and Roderick I. MacKenzie, Sp. Asst. Attys. Gen., St. Paul, for the State.

TODD, Justice.

The Marquette National Bank of Minneapolis (Marquette) sought to enjoin the First National Bank of Omaha (Omaha Bank) and its wholly-owned subsidiary, First of Omaha Service Corporation (Omaha Service) from issuing BankAmericard credit cards to the State of Minnesota. The Omaha Bank program assessed customers an annual interest rate of 18 percent on unpaid balances of less than $1,000, to be computed upon the prior month's balance of the individual account. The Minnesota Credit Card Act (Minn.St. 48.185)[1] sets a maximum interest rate of 12 percent per annum with the interest charge to be based on an amount no greater than the average balance of the individual account for the prior month. As a result of procedural actions, Omaha Service remains as the only defendant, but the matter was considered as though the Omaha Bank still remained as a defendant. The district court entered judgment permanently enjoining Omaha Service from soliciting BankAmericard customers on behalf of the Omaha Bank in Minnesota in contravention of the provisions of Minn.St. 48.185. We reverse.

Prior to the hearing on the matter, the parties agreed to a stipulation of facts which provides:

"I.

"Subd. 4. No charges other than those provided for in subdivision 3 shall be made directly or indirectly for any credit extended under the authority of this section, except that there may be charged to the debtor:

"(a) Annual charges, not to exceed $15 per annum, payable in advance, for the privilege of using a bank credit card which entitled the debtor to purchase goods or services from merchants, under an arrangement pursuant to which the debts resulting from the purchases are paid or satisfied by the bank or savings bank and charged to the debtor's open and loan account with the bank or savings bank."

---

1. Minn.St. 48.185 provides in pertinent part: "Subd. 3. A bank or savings bank may collect a periodic rate of finance charge in connection with extensions of credit pursuant to this section, which rate does not exceed one percent per month computed on an amount no greater than the average daily balance of the account during each monthly billing cycle. If the billing cycle is other than monthly, the maximum finance charge for that billing cycle shall be that percentage which bears the same relation to one percent as the number of days in the billing cycle bears to 30.

"The BankAmericard plan is a national and international bank credit card system which enables cardholders to purchase goods and services from participating merchants and obtain cash advances from participating banks throughout the United States and the world. The First National Bank of Omaha, which is not a defendant herein, is a national bank with its charter address in Omaha, Nebraska, is a card issuing member in the BankAmericard plan, and as such has issued (prior to the restraining order) and intends to issue * * * BankAmericard credit cards to Minnesota residents who qualify for them.

"II.

"Defendant First of Omaha Service Corporation is a wholly-owned subsidiary of First National Bank of Omaha. Its principal place of business is in Omaha, Nebraska but it is authorized to transact business in the State of Minnesota and intends, unless restrained or enjoined, to transact business in the State of Minnesota in the manner set forth and described in Paragraph III of this Stipulation.

"III.

"Defendant First of Omaha Service Corporation will participate in the system by entering into agreements with Minnesota merchants and Minnesota banks which will govern the participation of those merchants and banks in the system. * * * While participating Minnesota banks will not have the authority to issue cards or extend credit directly in connection with BankAmericard transactions, they will advertise the BankAmericard plan and solicit applications for BankAmericards from Minnesota residents which are then forwarded to First National Bank of Omaha for acceptance or rejection, and they will serve as a depository for BankAmericard sales drafts deposited by participating merchants with whom defendant First of Omaha Service Corporation has member agreements.

"IV.

"The First National Bank of Omaha has solicited and intends to solicit Minnesota residents on a continuous and systematic basis, in order to induce them to enroll in the First National Bank of Omaha's BankAmericard program. This solicitation program will be carried out by direct mail solicitation, telephone contact and through Minnesota banks. * * *

"V.

"Minnesota cardholders wishing to purchase goods and services or obtain cash advances with a BankAmericard issued by the First National Bank of Omaha, sign a BankAmericard form evidencing the transaction which is authenticated by the cardholder's BankAmericard credit card, and exchange the signed form for goods or services or cash from a participating Minnesota merchant or bank, respectively. The sales draft forms are then deposited by the participating Minnesota merchant to his account with a participating Minnesota bank for credit, which will then forward them and cash advance drafts drawn on such bank to the First National Bank of Omaha for credit.

"VI.

"The First National Bank of Omaha renders periodic statements to its Minnesota cardholders and charges finance charges on the unpaid balance of the cardholder's account. Such finance charges are assessed at the rate of 1-½% per month on the first $999.99 of the customers account for an annual percentage rate of 18%, and 1% a month on amounts of $1,000 and more for an annual percentage rate of 12%. * * * [T]he finance charges assessed by the First National Bank of Omaha are computed on the daily outstanding balance of cash advances and on the entire previous balance of purchases of goods or services before deducting any payments made during the billing cycle. No finance charges are imposed on the purchases portion of the account balance when the previous month's total balance is paid in full on or before the due date shown on the monthly statement. Minnesota cardholders may pay all of their account balance in full or defer payment by paying an installment thereof. Payments of

account balances are remitted by Minnesota residents directly to the First National Bank of Omaha.

"VII.

"The defendant First of Omaha Service Corporation and participating Minnesota banks are or will be paid a fee for their services rendered to the First National Bank of Omaha. Defendant First of Omaha Service Corporation and the participating Minnesota banks do not directly receive interest. However, the First of Omaha Service Corporation does accept assignments of delinquent accounts from the First National Bank of Omaha, and as an incident to collecting these accounts, does collect interest.

"VIII.

"The defendant First of Omaha Service Corporation intends, unless further restrained or enjoined, to immediately commence solicitation of potential participating Minnesota banks and Minnesota merchants so that they may perform the functions described in Paragraph III and IV of this Stipulation in connection with the BankAmericard credit card program conducted by the First National Bank of Omaha. Interest rates will be assessed to Minnesota resident cardholders in the manner set forth in Paragraph VI of this Stipulation. Said interest rates are imposed by the First National Bank of Omaha in reliance on rates permitted in the State of Nebraska under Revised Statutes of Nebraska, 1943, and Cumulative Supplement, Secs. 8–815—8–823, 8–825—8–829, as added by Laws 1969, Chapter 31 (L.B. No. 52) as amended, and other laws of Nebraska, which the defendant First of Omaha Service Corporation contends are permitted to be charged to Minnesota residents by virtue of the provisions of the National Bank Act, Title 12 U.S.C. § 85.

"IX.

"The plaintiff The Marquette National Bank of Minneapolis ('Marquette') is asking for temporary and permanent injunction restraining the defendant First of Omaha Service Corporation, and all persons acting as officers, employees or agents thereof, from engaging in any solicitation of residents of the State of Minnesota or other activity in connection with the offering or operation of a bank credit card program in the State of Minnesota in violation of Minnesota Statutes, Section 48.185.

"X.

"Plaintiff Marquette is a national bank with its main banking office in Minneapolis, Minnesota, is a card-issuing member in the BankAmericard plan and as such has issued and continues to issue cards to Minnesota residents who qualify for them. * * *

"XI.

"Since the enactment on April 8, 1976, of Chapter 196, Laws of Minnesota 1976, codified as Minnesota Statutes, Section 48.185, the plaintiff Marquette has assessed charges in connection with its BankAmericard credit card program in reliance on such Statute as follows: a $10 annual charge for the privilege of using the card and, in addition a finance charge equal to 1% per month (12% annual percentage rate). * * * [T]he finance charge of 1% per month assessed by plaintiff Marquette is computed on the average daily balance of the cardholder's amount during each monthly billing cycle, except that where the account balance is attributable solely to purchases of goods and services charged to the account during one billing cycle, and the amount is paid in full before the due date of the first statement issued after the end of that billing cycle, no finance charge is charged on that balance."

■ The procedural history of this case is significant. Marquette originally commenced an action in Minnesota district court against the Omaha Bank, Omaha Service, and the Credit Bureau of St. Paul, Inc., alleging violations of the Minnesota Credit Card Act (Minn.St. 48.185), and the Minnesota Deceptive Trade Practices Act (Minn.St. 325.772); and seeking money damages and injunctive relief to restrain the defendant from solicitation in Minneso-

ta for defendant's BankAmericard program. Since the Omaha Bank was a national bank, the case was removed to the United States District Court for Minnesota pursuant to 28 U.S.C.A., § 1441. Marquette thereafter dismissed Omaha Bank as a party defendant, resulting in the case being remanded back to the state district court because of a lack of Federal subject matter jurisdiction.[2] The case then proceeded solely against Omaha Service. However, because Omaha Service's function is limited to entering into agreements with merchants and local banks, and, since it does not have control over the issuance of credit cards or establishing the rate of finance charge, the case was treated as if the Omaha Bank was still the defendant.

The district court issued a permanent injunction against Omaha Service prohibiting the "solicitation of residents of the State of Minnesota or other activity in connection with * * * the operation of a bank credit card program" which violates Minn.St. 48.185. In issuing the permanent injunction, the court held that while Federal law prevents states from enacting laws which discriminate against classes of lendors, it does not preclude states from discriminating against classes of loans. The principal issue presented on appeal is whether a state may regulate, by statute, the credit card interest rate charged by a national bank located in another state but conducting business within the regulating state.

National banks are regulated by the United States Congress. The amount of interest which a national bank may charge its customers is governed by 12 U.S.C.A., § 85, which provides in part:

"Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, *interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, * * *.*" (Italics supplied.)

The application of this section to interstate credit transactions has been recently considered by both the Seventh and Eighth Circuit Courts of Appeals. In *Fisher v. First National Bank of Chicago*, 538 F.2d 1284 (7 Cir. 1976), certiorari denied, 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 778 (1977), the court addressed a situation in which a national banking association with its principal place of business in Illinois was charging Fisher, an Iowa resident, interest on the unpaid balance of his monthly BankAmericard statement at a rate allowable in Illinois. Fisher brought an action alleging that the Illinois bank was charging usurious interest to Iowa residents under its BankAmericard program. In permitting the Illinois bank to assess Illinois interest rates to Iowa resident users of the credit card, the court of appeals stated (538 F.2d 1289):

"* * * The defendant here is located, established and organized in only Chicago, Illinois, and is subject therefore to the rate of interest 'allowed by the laws of the State' of Illinois. If we could stop there and only look at the first portion of § 85, we could easily conclude that the 18% per annum rate of interest allowed by the Illinois Revolving Credit Act, Ill. Rev.Stat., ch. 74, § 4.2 (1973), governs the rate chargeable by the defendant within Illinois and anywhere else that it might do business. The language is certainly broad enough to bear that interpretation. It refers to the interest on 'any loan or discount made' as being governed by the laws of the single state where the national bank can be located.

"* * * The crux of this case is what law governs when the Chicago-located national banking association does business in another state, here Iowa. * *

* * * * * *

"We would summarize the statute as it applies to this case as follows: Illinois'

2. If Marquette had not dismissed the Omaha Bank as a party defendant, the case would have undoubtedly been transferred to the United States District Court for Nebraska since a national bank can only be sued in the forum where it is established. See, *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976).

18% per annum statute applies to *all* loans made by the defendant Illinois national banking association, whether made in Illinois or elsewhere, but if the defendant is 'existing' in Iowa and if Iowa allowed, which it apparently does not, a rate of interest to its own state banks in excess of 18%, the defendant could charge such higher rate to the defendant's customers in Iowa."[3]

After the action against the Illinois bank was in progress, the same plaintiff brought an almost identical action against the First National Bank of Omaha, challenging its right to charge Iowa resident customers of the Omaha BankAmericard program interest rates allowable in Nebraska. In *Fisher v. First National Bank of Omaha*, 548 F.2d 255, 257 (8 Cir. 1977), the court of appeals, in denying the plaintiff's claim, stated:

" * * * The question is whether under the National Bank Act we are required to apply the law of Nebraska or the law of Iowa to transactions which were initiated in Iowa but consummated in Nebraska. * * *

" * * * We are persuaded, however, that it really makes no difference whether the transactions are characterized as being Nebraska transactions or whether they are characterized as Iowa transactions.

"In the very recent case of *Fisher v. First Nat'l Bank of Chicago*, 538 F.2d 1284 (7 Cir. 1976), it was held that under the provisions of § 85, if a national bank in one state makes a loan in another state in which it is doing business, and if there is a differential between the maximum rate allowable in one state and the maximum rate allowable in the other state with respect to the same class of debt, the bank may charge the higher of the two rates.

"We find ourselves in agreement with that holding. And when it is applied to this case, it is clear that the bank is entitled to charge on these transactions the highest permissible Nebraska rate for the same class of loan regardless of whether the loan is made in Nebraska or Iowa since the maximum rate allowable in Iowa is no higher than the maximum rate allowable in Nebraska. If Iowa permitted a higher rate, which it does not, the bank would be entitled to charge the higher rate."

Thus, we have a situation where the Eighth Circuit Court of Appeals, which includes the State of Minnesota, has adopted with approval the view of the Seventh Circuit that a national bank can charge its credit customers an interest rate allowable in the state where it is physically located, or the interest rate of the state where it is doing business, whichever is higher. At this point, the procedural history of this case assumes a greater importance. It appears fairly obvious that if the Omaha Bank had remained as a party defendant, the Federal District Court for Minnesota or for Nebraska would have followed the opinion of the Eighth Circuit.

In reaching a decision to enjoin Omaha Service and, in practical effect, the Omaha Bank from operating their BankAmericard

---

**3.** But see, *Meadow Brook National Bank v. Recile*, 302 F.Supp. 62, 73 (E.D.La.1969), in which the court reasoned: "In effect, 12 U.S.C. § 85 provides that a national bank may charge interest at the rate allowed by the laws of the state where the bank is located. The question is whether this was meant to fix the rate of interest on *all* loans made by the bank or merely those loans made in that state. Admittedly, the above quoted language would seem to include all loans made by the bank and not solely those made in the state where the bank is located. * * *

\*    \*    \*    \*    \*    \*

"We hold that 12 U.S.C. § 85 fixes the rate of interest chargeable by a national bank only as to loans made in the state where the bank is located; it does not fix the rate of interest which may be charged by a national bank which is located in one state and makes a loan in another state."

This reasoning was disapproved by the Seventh Circuit in *Fisher v. First National Bank of Chicago*, 538 F.2d 1284, 1290 (7 Cir. 1976), certiorari denied, 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 778 (1977): "We are not inclined to so twist the plain meaning of the statute. It clearly states that the interest on 'any loan' is governed by the rate allowed by the state 'where the bank is located,' which in this case is Illinois."

program in Minnesota in violation of § 48.-185, the district court sought to distinguish the two *Fisher* cases. In a well-reasoned memorandum accompanying its order, the district court discussed and interpreted the *Fisher* cases in light of the factual situation of the present case and determined those cases to be inapplicable as there did not exist a statute setting a credit card rate of interest in any of the states involved. The court concluded that while 12 U.S.C.A., § 85, precludes states from discriminating against lendors as a class, it does not prohibit a state from establishing classes of loans which are applied uniformly to all banks doing business in the state. If we were writing on a clean slate, this reasoning would appear to be more consistent with the history and purpose of the National Bank Act.

The particular section of the National Bank Act under consideration in this case has been in existence for over a century. Obviously, the ramifications and problems resulting from bank credit card financing could not have been considered by Congress at the time of its adoption. Furthermore, a rather strong argument can be made that credit card financing is not purely banking business even though a bank may administer the program. The original version of the National Bank Act was enacted by Congress to protect national banks from discriminatory economic legislation by individual states in which the various national banks were located. The result of the Federal legislative efforts was to create what has commonly been referred to as a "most favored lendor status" for national banks. *First National Bank in Mena v. Nowlin,* 509 F.2d 872, 879 (8 Cir. 1975); *United Missouri Bank of Kansas v. Danforth,* 394 F.Supp. 774, 779 (W.D.Mo.1975). In the landmark case of *Tiffany v. National Bank of Missouri,* 85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1874), the laws of Missouri limited the amount of interest chargeable by banks organized under state laws to 8 percent but allowed all other persons in the state to assess a 10-percent interest charge upon credit transactions. Within this statutory scheme a national banking association or-

ganized and located in the State of Missouri charged its credit customers a 9-percent interest rate which was alleged to be usurious. In an early interpretation of virtually identical statutory language to that employed in 12 U.S.C.A., § 85, the Supreme Court held that the National Bank of Missouri could lawfully charge its customers a 10-percent interest rate and reasoned (85 U.S. [18 Wall.] 412, 21 L.Ed. 683):

" * * * Coupled with the general spirit of the act, and of all the legislation respecting National banks, it is controlling. It cannot be doubted, in view of the purpose of Congress in providing for the organization of National banking associations, that it was intended to give them a firm footing in the different States where they might be located. It was expected they would come into competition with State banks, and it was intended to give them at least equal advantages in such competition. In order to accomplish this they were empowered to reserve interest at the same rates, whatever those rates might be, which were allowed to similar State institutions. This was considered indispensable to protect them against possible unfriendly State legislation. Obviously, if State statutes should allow to their banks of issue a rate of interest greater than the ordinary rate allowed to natural persons, National banking associations could not compete with them, unless allowed the same. On the other hand, if such associations were restricted to the rates allowed by the statutes of the State to banks which might be authorized by the State laws, unfriendly legislation might make their existence in the State impossible. A rate of interest might be prescribed so low that banking could not be carried on, except at a certain loss. The only mode of guarding against such contingencies was that which, we think, Congress adopted. It was to allow to National associations the rate allowed by the State to natural persons generally, and a higher rate, if State banks of issue were authorized to charge a higher rate. This con-

struction accords with the purpose of Congress, and carries it out. It accords with the spirit of all the legislation of Congress. National banks have been National favorites. They were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the General government. It could not have been intended, therefore, to expose them to the hazard of unfriendly legislation by the States, or to ruinous competition with State banks."

The decisions reached in the *Fisher* cases injected a new attribute into the "most favored lendor status," which resulted in allowing the interstate shipment of interest rates by national banks in their credit card programs. This result is accomplished despite the fact that the individual state has attempted to specifically limit the interest rates allowable on certain loan transactions and its laws apply uniformly to all lending institutions within the state. Thus, by allowing a national bank to transport a given interest rate under these circumstances could afford it a distinct advantage in competing with state banking institutions, an advantage which appears to be contrary to the original purpose in adopting this particular section of the National Bank Act.

However, we deem it inappropriate for this court to permit the use of procedural devices to obtain a result inconsistent with the existing doctrine in the Eighth Circuit. Consequently, we must reverse the district court's order which enjoins Omaha Service from operating the Omaha Bank's BankAmericard program by charging an interest rate in violation of § 48.185. Consistent with the reasoning in the Fisher cases, the Omaha Bank may assess an interest rate to its BankAmericard customers in Minnesota which complies with the applicable Nebraska statutory interest rate. See, Neb.Rev.Stat. § 8–820.

Finally, we observe that under the present situation it is the responsibility of the United States Congress to resolve the obvious inequities created. A national bank engaged in the interstate business of credit card financing should not be able to avoid the provisions of Minnesota law relating to allowable interest rates. The granting of a pecuniary advantage to the national banks seems inconsistent with the original purposes of the banking act and contrary to the expressed local interest of the state in protecting its citizens from excessive financing charges.

Reversed.

SHERAN, Chief Justice (concurring specially).

I agree with the result. I do not agree that the public suffers by application of the law in this case where users of credit cards now have a choice between competing suppliers.

SCOTT, Justice (dissenting).

I respectfully dissent. The original purpose of 12 U.S.C.A., § 85, of the National Bank Act was to prohibit states from discriminating against national banks in favor of local financial institutions. It was intended to put "national banks on an equal footing with the most favored lenders in the state without giving them an unconscionable and destructive advantage over all state lenders." *First National Bank in Mena v. Nowlin,* 509 F.2d 872, 880 (8 Cir. 1975). Section 85 thus was intended to insure *intrastate* competitive equality among state lenders and national banks.

The *Fisher* decisions and the majority of this court interpret § 85 to apply in situations involving *interstate* transactions. These decisions and the majority would allow a credit card subsidiary of a Nebraska national bank to have rights greater than those enjoyed by national banks located in Minnesota. The shield of the Act has thus been turned into a sword which can now be used by national banks located outside Minnesota against local national banks. National banks located outside Minnesota would not only have most favored lender status in Minnesota, but rights greater than the most favored lender. Surely this result is not within the contemplation of the National Bank Act.

As the majority opinion states, "The decisions reached in the *Fisher* cases injected a new attribute into the 'most favored lender status,' which resulted in allowing the interstate shipment of interest rates by national banks in their credit card programs." Additionally, should a simple credit card transaction between a local citizen and a local merchant be construed as a bank loan by the Nebraska bank to a Minnesota citizen as Fisher proclaims without question? Minnesota should reject such an extension as a misinterpretation of the National Bank Act[1] and exercise its own judgment. In such matters we are not bound by the Federal circuit court cases but only by holdings of the United States Supreme Court.[2] E. g., *United States ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1076 (7 Cir. 1970).

I would therefore affirm the trial court's issuance of the permanent injunction against Omaha Service prohibiting the solicitation of credit card customers in Minnesota as a violation of Minn.St. 48.185.

YETKA, Justice (dissenting).

I join in the dissent of Mr. Justice SCOTT.

WAHL, Justice (dissenting).

I join in the dissent of Mr. Justice SCOTT.

---

1. The trial court, in its order of December 22, 1976, stated: "To take a statute that has been on the books for almost 100 years and find in that law an intention, in 1976, to nullify a financial practice of 200 years standing is ludicrous and makes a mockery of the doctrine of legislative intent. If there be any intent in Congress it must be to preserve the financial customs of so long a standing in our Republic."

2. "While a decision of a federal court, other than the Supreme Court, may be persuasive in a state court on a federal matter, it is, nevertheless, not binding, since the state court owes obedience to only one federal court, namely the Supreme Court." 1B Moore, Federal Practice, Par. 0.402[1], p. 65 (2 ed.).